UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER DEAN KRYGER,<br><br>Petitioner,<br><br>vs.<br><br>WARDEN DAN SULLIVAN,  THE ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA,<br><br>Respondent. | 4:22-CV-04086-LLP<br><br><br>REPORT AND RECOMMENDATION |

**TABLE OF CONTENTS**

| | | | **Page** |
|---|---|---|---|
| **INTRODUCTION** | | | **1** |
| **A.** | **State Court Criminal Proceedings** | | **1** |
| 1. | Pretrial Proceedings | | **1** |
| 2. | Hearing on Rule 404(b) Evidence—2008 Incident | | **2** |
| 3. | Pretrial Motions | | **8** |
| 4. | Jury Trial | | **10** |
| | a. | The State's Case | **11** |
| | | i.   Family and Friends of Kari | **11** |
| | | ii.  Police and First Responders | **17** |
| | | iii. Further Police Investigation | **24** |
| | | iv.  Lay Witnesses From the Community | **33** |
| | | v.   Scientific Witnesses | **40** |

| | | vi. | Lead Detective Sgt. Hoffman | **47** |
| | b. | | Closing Arguments | **52** |
| | | i. | Prosecution | **52** |
| | | ii. | Defense | **57** |
| | | iii. | Rebuttal | **62** |
| | c. | | Inadvertent Jury View of Mr. Kryger | **64** |
| 5. | | | Sentencing | **67** |
| **B.** | | | **Direct Appeal** | **68** |
| 1. | | | Limitations on Cross-Examining Brian Johnson | **69** |
| 2. | | | Admission of Dr. Snell's Expert Opinion | **71** |
| 3. | | | Admission of Irrelevant Evidence | **71** |
| 4. | | | Admission of Mr. Kryger's "Criminal Mind" Statement | **71** |
| 5. | | | Denial of Defense Motions for Mistrial | **73** |
| 6. | | | Jury Instructions | **73** |
| 7. | | | Sufficiency of the Evidence | **73** |
| **C.** | | | **State Habeas Proceedings** | **75** |
| **D.** | | | **Mr. Kryger's § 2254 Claims in This Court** | **80** |
| **DISCUSSION** | | | | **81** |
| **A.** | | | **Scope of a § 2254 Petition** | **81** |
| **B.** | | | **Judgment on the Pleadings Standard** | **82** |
| **C.** | | | **Ineffective Assistance of Counsel—Claim One** | **83** |
| 1. | | | Standard for Ineffectiveness Claims | **83** |
| 2. | | | Counsel's Alleged Unpredaredness | **87** |

|  |  |  |  |
|---|---|---|---|
|  | 3. | Counsel's Failure to Object or Question | **90** |
| **D.** | **Confrontation Clause—Claim Two** |  | **91** |
|  | 1. | Federal Confrontation Clause Law | **92** |
|  | 2. | Application of the Law to Mr. Kryger's Claim | **97** |
| **E.** | **Sufficiency of the Evidence—Claim Three** |  | **101** |
|  | 1. | Standard for Evaluating a Due Process Sufficiency of the Evidence Claim | **101** |
|  | 2. | The Jury was Properly Instructed | **104** |
|  | 3. | Sufficiency of the Evidence | **105** |
|  |  | i.   Identity | **105** |
|  |  | ii.  Premeditation | **109** |
|  | 4. | Irrelevant Evidence | **110** |
| **F.** | **Jury Exposure to Mr. Kryger in the Hallway—Claim Four** |  | **113** |
|  | 1. | Standard Applicable Under AEDPA | **115** |
|  | 2. | Supreme Court Precedent and Lower Court Decisions | **118** |
| **CONCLUSION** |  |  | **122** |

[The balance of this page was intentionally left blank.]

**INTRODUCTION**

This matter is pending before the court pursuant to the *pro se* petition pursuant to 28 U.S.C. § 2254 of Christopher Dean Kryger, a person incarcerated pursuant to a judgment of a South Dakota state court.  <u>See</u> Docket No. 1.  Now pending is a motion to dismiss Mr. Kryger's petition without holding an evidentiary hearing by respondent.  <u>See</u> Docket No. 11.  Mr. Kryger has not responded to the motion and the time for doing so has passed.  This matter has been referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 57.11.

**FACTS**

**A.    State Criminal Proceedings**

**1.    Pretrial Proceedings**

Mr. Kryger was charged by complaint first (<u>State v. Kryger</u>, CRI 14-1956 at 6-8, (S.D. 2nd Cir., Minnehaha Cnty. April 27, 2016) ("CR")), and then by indictment (CR at pp. 18-20), asserting he had murdered and raped 56-year-old Kari Kirkegaard, and burglarized her home.  The state filed a part II information alleging Mr. Kryger was an habitual offender by reason of two prior convictions, one for burning within a structure where a person is confined and one for aggravated assault.  CR at pp. 22-23.  Attorneys Mark Kadi and Austin Vos were appointed to represent Mr. Kryger.

Mr. Kadi filed a motion for disclosure of other bad acts evidence under Rule 404(b) of the rules of evidence (SDCL § 19-12-5).  CR at pp. 24-25.  He also filed an order for a copy of the grand jury transcript.  <u>Id.</u> at p. 26.  The

1

state filed its own motion seeking to admit 404(b) evidence concerning a prior incident in December 2008 when Mr. Kryger was charged with rape, aggravated assault, burglary, and kidnapping.  Id. at pp. 29-30.  Mr. Kadi then filed a motion *in limine* seeking to exclude evidence at trial of Mr. Kryger's criminal convictions and any 404(b) evidence, specifically the 2008 incident.  Id. at pp. 32-34.

Mr. Kadi filed a motion for discovery of DNA evidence as well as other evidence in the state's possession.  Id. at pp. 35-39.  Another motion sought discovery of witness statements, Mr. Kryger's statement, his prior criminal record, all documents intended to be used by the state at trial, the names of all witnesses, police reports, the victim's medical records, and various other items.  Id. at pp. 46-50.  Mr. Kadi also filed a motion *in limine*  to exclude any evidence of the 2008 incident because the state had destroyed or failed to preserve photos and recorded statements by the alleged victim and other witnesses.  Id. at pp. 51-53.

Mr. Kadi made a motion for the appointment of a DNA expert on Mr. Kryger's behalf.  That motion was granted by the trial court. Id. at pp. 80-81.

### 2.    Hearing on 404(b) Evidence—2008 Incident

The state trial court held a hearing on the subject of the admissibility of the evidence of an incident involving Mr. Kryger which had occurred in 2008.

Id. at pp. 85-186; 229-77.[1]  At the hearing, Mr. Kadi called Captain Blaine
Larsen, Sergeant David Huntimer, and Detective Martin Hoffman, all of the
Sioux Falls Police Department ("SFPD").  Id. at pp. 91, 98, 105.  These three
law enforcement officers testified that they were involved in the investigation of
the 2008 incident, but that the recordings and photographs they took to
document their investigation had been destroyed or lost.  Id. at pp. 91-123.

The state called T.N., the victim of the December 5, 2008, assault.  Id. at
p. 146.  She testified that she had emigrated from Ethiopia to Sioux Falls,
South Dakota in 2007.  Id. at p. 147.  On the date of the incident, she was
living in apartment nine with her sisters while her brothers lived in the same
building in apartment eight.  Id. at p. 148.  On that day, she had prepared
meals to get ready to go to her job.  Id.  The door to apartment nine was locked.
Id. at p. 149.  Someone knocked on the door.  Id.  Thinking it was one of her
brothers, she called out that they could let themselves in with a key.  Id. at
p. 150.  She then went into the bathroom when she heard a great noise,
seemingly shaking the whole building.  Id.  She ran out and there was a man
inside her apartment covering his face with a hat and wearing a tan or brown
coat.  Id. pp. 150, 159-60.  He was of medium height, but she could tell by his
eyes that he was a white man.  Id. at p. 150.

The man grabbed T.N. by the throat and told her if she screamed he
would kill her.  Id. at p. 151.  It was difficult for T.N. to breathe.  Id.  T.N. lost

---

[1] The page numbers cited to are the sequential page numbers on the entire
state court criminal file rather than the page numbers of the transcript of the
hearing.

3

consciousness and did not wake up until 11:30 p.m. Id. She had an injury to her neck and a wound on her back when she woke up. Id. at p. 152.

Two months later, a female police officer spoke with T.N. and said that the DNA test came back from the lab and it did not match Mr. Kryger's DNA. Id. at p. 158. T.N. argued with the officer and asserted Mr. Kryger had raped her, so how could the DNA not match? Id. T.N. testified the charges against Mr. Kryger were then dismissed. Id. at p. 159.

The prosecution also called T.N.'s brother, J.N., to testify. Id. at p. 124. In December 2008, J.N. testified he, T.N., their brother Mustafea, and their father all worked at the same workplace and all worked the 6:00 p.m. to 6:00 a.m. shift. Id. at pp. 125-26, 128. J.N. drove the family to work because he was the only one that owned a car. Id. at p. 126. Before driving to work, the family usually ate a meal together. Id. at p. 127. On December 5, 2008, J.N. and his brother ate a meal together with T.N. in T.N.'s apartment. Id. T.N. was the only sister home at the time. Id.

Just outside T.N.'s apartment after supper, J.N. and Mustafea encountered a stranger in the hallway. Id. Later identified as Mr. Kryger, the stranger asked the brothers in which apartment a particular person lived. Id. at p. 130. The brothers did not recognize the stranger, nor did they recognize the name of the person he was purportedly looking for. Id. J.N. testified the residents of the apartment building all knew each other and in which apartment each lived. Id. He suggested the stranger go to another building and look because no one by that name lived in his building. Id. at pp. 130-31.

4

Mr. Kryger was wearing a kind of brown coat with a hat on his head pulled down close over his eyes.  <u>Id.</u> at p. 138.

    After this encounter, J.N. went outside to start his car to warm it up and was joined shortly thereafter by Mustafea.  <u>Id.</u> at pp. 128, 131.  T.N. did not come to the car as expected, so J.N. sent Mustafea back to T.N.'s apartment to check on her.  <u>Id.</u> at pp. 128-29.  Mustafea went back to T.N.'s apartment and found the door had been broken in.  <u>Id.</u> at p. 129.  He did not enter the apartment, but called out for T.N., who did not answer.  <u>Id.</u>  Mustafea ran back to J.N. and reported what he had seen.  <u>Id.</u>  J.N. then ran upstairs to T.N.'s apartment.  <u>Id.</u> at p. 130.

    As J.N. approached T.N.'s apartment, he encountered Mr. Kryger coming out of the apartment.  <u>Id.</u> at p. 131.  Mr. Kryger stated to J.N. that he didn't know who broke the door to T.N.'s apartment.  <u>Id.</u>  J.N. challenged Mr. Kryger's veracity.  <u>Id.</u>  Mr. Kryger started running, stuffing his hat into his jacket pocket, but the two brothers ran after him and caught him.  <u>Id.</u> at pp. 131-32, 138.  They then called the police.  <u>Id.</u> at p. 132.

    J.N. then went back to T.N.'s apartment and entered.  <u>Id.</u> at p. 133.  He found T.N. lying on the bed, naked.  <u>Id.</u>  He touched T.N. and called her name and she did not respond.  <u>Id.</u> at p. 137.  J.N. thought his sister was dead.  <u>Id.</u>  He ran back to try to attack Mr. Kryger, but the police held J.N. back.  <u>Id.</u> at pp. 133, 137.

    Mr. Kadi then called Sgt. Candace Gearman, who interviewed T.N. the night of the assault, and who also spoke to medical personnel.  <u>Id.</u> at pp. 160-

65.  Sgt. Gearman observed redness around T.N.'s right eye, marks by her left temple, and striations on both her neck and clavicle area.  Id. at p. 176.  T.N. was curled up in the fetal position, would not make eye contact with the officer, teared up, and was in shock and shivering.  Id.

T.N. told Sgt. Gearman that Mr. Kryger had strangled her, putting his hands around her throat numerous times and drug her into the bedroom.  Id. at p. 177.  He held her from behind and pushed her to the ground face down. Id.  T.N. struggled to get away, but Mr. Kryger kept his hands around her throat and was striking her on the back shoulder area.  Id.  T.N. then passed out.  Id.

T.N. told Sgt. Gearman that she had never had sex with anyone nor had been raped before this incident, but the medical examination found no signs of trauma to T.N.'s labia, anus, vagina, or hymen.  Id. at 161-65, 168.  Medical staff also did not find any injury to T.N.'s back, although they verified the injuries to her neck.  Id.  Sgt. Gearman testified the DNA lab results did not match Mr. Kryger's DNA.  Id. at p. 166.  Sgt. Gearman testified the recordings made during the investigation of the assault on T.N. were released by her for destruction within one year before the attack on Ms. Kirkegaard because no prosecution had ensued.  Id. at pp. 169-70.

Mr. Kadi also called Greg McNamara, an investigator employed by the prosecution's office.  Id. at p. 229.  He testified the audio and video recordings from the December 5, 2008, investigation were no longer to be found.  Id. at p. 231.

6

The prosecution then called Officer Nicholas Stevens of the SFPD. Id. at p. 235. Officer Stevens testified to some statements Mr. Kryger volunteered as Officer Stevens was driving Mr. Kryger to the police station. Id. at pp. 235-42.

At the conclusion of the evidence, the state trial court ruled that the 2008 incident could be presented by the prosecution at Mr. Kryger's trial as 404(b) evidence, though the state would not be permitted to argue that Mr. Kryger actually raped T.N. Id. at pp. 274, 278.

The court found the evidence from both incidents demonstrated a common scheme or plan: Mr. Kryger was riding his bicycle immediately before each incident at a time of year when riding bicycles was unusual (December and March); in both cases he had recently obtained liberty to move about in the community after having previously been imprisoned; both victims were unknown to Mr. Kryger; both victims were alone in their homes at the time of the attacks; both incidents involved Mr. Kryger quickly using force to subdue or gain control of the women by strangulation; and both victims suffered strangulation injuries. Id. at pp. 275-77.

This ruling was later retracted two weeks before the scheduled November trial date; the court concluded that introduction of the evidence of the 2008 incident risked confusing the jury and creating undue delay by in effect having a mini-trial within a trial. Id. at 378-81. The state asked the court to reconsider this ruling and the court denied that motion. Id. at pp. 672-73.

7

### 3.    Pretrial Motions

In May 2015, Mr. Kadi filed several motions related to the conduct of the trial.  He sought additional peremptory challenges (id. at pp. 287-88), he sought permission to submit questionnaires to the jury to elicit additional information (id. at pp. 289-90), he moved for individual voire dire and sequestration (id. at pp. 291-93), he moved *in limine* to limit opinion evidence based on the fact the coroner could not state with a reasonable degree of medical certainty that the victim had been raped (id. at pp. 294-97), and he moved to be allowed to present Rule 412 evidence regarding the victim of the 2008 incident (id. at pp. 300-06).

Jury trial was scheduled   July 16-31, 2015.  Id. at pp. 309-11, 336 (as evidenced by dates on subpoenas).  However, the prosecution had recently discovered many of the previously-missing documents and recordings from the 2008 incident and turned them over to the defense on June 1, 2015, thus prompting a defense motion to continue the trial.  Id. at pp. 312-13, 332-33. The request for postponement of trial appears to have been granted and trial was reset for November 2-24, 2015.  Id. at pp. 343; 355, 357, 359 (dates for Mr. Kryger to be transported to the Minnehaha County Courthouse[2] and dates on trial subpoenas).

An evidentiary hearing was held regarding Mr. Kadi's motion to exclude opinion evidence.  Id. at pp. 728-83.  The coroner, Dr. Snell, testified and the

---

[2] Mr. Kryger was imprisoned at the South Dakota State Penitentiary on another matter at the time of his state trial court proceedings involving the murder and rape of Kari Kirkegaard.

court heard argument from both parties.  Id.  The court partially granted the
defense motion, holding that Det. Hoffmann would not be allowed to opine
whether the injuries to the victim's vagina were consistent with sexual assault.
Id. at p. 678.  However, the court allowed Dr. Snell to give an opinion because
his opinion was stated within a reasonable degree of medical certainty.  Id.

Thereafter, Mr. Kadi continued to file motions in preparation for the trial.
On June 5, 2015, he filed a motion *in limine* to prohibit introduction of autopsy
photos of the victim.  Id. at pp. 330-31.  Twelve days before the July start of
trial, Mr. Kadi filed a motion *in limine* to prevent the audience or any persons
within the courtroom from displaying photos of the victim within the jury's
view.  Id. at pp. 406-07.  Another motion *in limine* sought to prevent any person
from live streaming video from the courtroom.  Id. at pp. 408-09.  An amended
motion *in limine* concerning autopsy photos was filed.  Id. at pp. 424-25.

A motion *in limine* seeking to exclude playing a recording of Mr. Kryger's
interview with police was filed.  Id. at pp. 426-27.  A subsequent motion
specifically sought to exclude any evidence that Mr. Kryger told police he had a
criminal mind.  Id. at pp. 442-43.  Another motion was made to allow
Mr. Kryger to exercise his constitutional right to voire dire the jury.  Id. at
pp. 428-29.  A motion *in limine* was made to exclude video evidence of
Mr. Kryger's arrest as he was dressed in prison clothing at that time.[3]  Id. at
pp. 444-45.

---

[3] Mr. Kryger had a 1993 conviction for aggravated assault for which he received
a sentence of 20 years' imprisonment.  See South Dakota Department of

The prosecution moved the court for permission to use a stun cuff on Mr. Kryger, noting his history of dangerous criminal convictions and the fact that on one occassion, Mr. Kryger refused to come to court.  Id. at p. 430.  The prosecution explained a stun cuff is an unobtrusive device worn on the ankle underneath the clothing that would not be seen by jurors.  Id. at p. 431.  The court granted the motion.  Id. at p. 432.

The court granted Mr. Kadi's motion to prevent media streaming from the courtroom (id. at p. 446), granted defense counsel's motion to allow Mr. Kryger to appear in court in civilian clothes (id. at p. 447), excluded Brian and Ronald Johnson from the courtroom during jury selection and during the trial due to previously-exhibited disruptive behavior in court (id. at pp. 448, 455-58), granted the motion to prevent photos of the victim being displayed in the courtroom (id. at p. 452), denied the motion to keep out autopsy photos (id. at pp. 674-75), and denied the motion to preclude Mr. Kryger's own statement to police that he had a criminal mind (id. at pp. 670-71, 676-77).

### 4.    Jury Trial

Jury selection began on November 3, 2015, at 8:30 a.m.  CR at p. 1642 (Jury Trial Transcript "JTT" Vol. 1A).  Jury selection continued that entire day and through the next three days, November 4-6.  Id. at pp. 2281 (JTT Vol. 2), 2693 (JTT Vol. 3), 2033 (JTT Vol. 4).  Strike down of the jury panel and

---

Corrections, https://doc.sd.gov/adult/lookup/ (last visited November 1, 2022). The court assumes his parole on this prior offense had been revoked and he was incarcerated on that charge at the time Minnehaha County officials charged him in the death of Kari Kirkegaard.

selection of alternates took place November 9, 2015.[4] Id. at p. 2310 (JTT Vol. 5). Opening statements and the first witnesses were called on November 10.

### a. The State's Case

### i. Family and Friends of Kari

The state's first witness was Paetyn Haemze, the one-time fiance of Kari Kirkegaard's son, Nicholas Kirkegaard ("Nick"). Id. at pp. 2767-68 (JTT Vol. 6). She testified every Friday night Kari's family would gather at a local pizza restaurant and share a meal and catch up on everyone's news. Id. at p. 2770. Paetyn was very close to Kari and lived with her for a time. Id. She testified Kari had a number of close female friends, but no close male friends. Id. at p. 2772. Kari had been diagnosed with breast cancer and had a lot of issues with migraine headaches. Id. She sometimes tried to treat her headaches by taking a bath. Id.

At the time of Kari's death, she was living by herself in a house across from an elementary school. Id. at 2773. The house had a front and back door. Id. On March 14, 2015, a Friday, Kari had attended the family pizza gathering as normal. Id. at p. 2773. Nick, her son, was there, although Paetyn did not attend. Id. at p. 2774.

On Sunday morning, March 16, Nick texted Kari—he and Paetyn often took Kari out for brunch or lunch on Sundays. Id. at p. 2775. Kari did not respond to Nick's text. Id. Paetyn tried texting Kari too, but also did not get a response. Id. Nick then called Kari and did not get an answer, so Nick and

---

[4] November 7 and 8 were a Saturday and Sunday in the year 2015.

Paetyn went to lunch by themselves.  Id. at p. 2776.  Nick and Paetyn both tried contacting Kari again and could not reach her.  Id.  Paetyn then went to Kari's home while Nick went to a sports event with a friend.  Id.  She arrived about 5:00 p.m. and noted that Kari's car was parked in the driveway and all the lights in the house were off.  Id.

Paetyn tried opening the front door, but the dead bolt was locked, something Kari rarely did.  Id. at pp. 2777-78.  Paetyn did not have a key to the dead bolt, so she went around to the back of the house and found the back door ajar and she entered.  Id. at p. 2778.  Kari never used the back door because the handle was broken, so it was unusual to find the back door ajar— it could only be closed  from the inside.  Id.  She didn't see Kari in the kitchen, the living room, or the bedroom.  Id. at p. 2779.  The bathroom door was cracked open and Paetyn could hear water running.  Id. at p. 2780.  She opened the door and saw Kari naked in the bathtub lying on her side facing toward Paetyn.  Id.  Paetyn could smell a strong odor of something like bleach.  Id.  Paetyn could tell Kari wasn't breathing, she was blue, so she ran outside the house and called Nick and 911.  Id.

Police arrived and then multiple members of Kari's family arrived on scene including Nick, her son; and her two brothers, Brian and Scott; her dad, Ron; and all of her cousins—about twenty people.  Id. at pp. 2781-82, 2792.  After the police removed Kari's body and left, the family entered the house.  Id. at p. 2782.  Kari's cousin noticed that all the bedding had been stripped off Kari's bed.  Id. at pp. 2783-84.  They checked in the washer and dryer to see if

12

the bedding was in there, but it wasn't.  Id. at p. 2784.  Someone went out to look in Kari's car to see if the bedding was in it, but there was nothing in the car.  Id.  Family members then noticed Kari's purse and keys were missing and they weren't in the car either.  Id.  The family also noticed all the towels and rugs had been removed from the bathroom.  Id.

The family called the police back and they returned to the scene.  Id. at p. 2785.  Paetyn testified she never knew Mr. Kryger and did not know him to be involved in Kari's life.  Id. at p. 2786.  Kari was known to bite her fingernails down to the nub.  Id. at p. 2794.

Kari's son, Nick, testified that he and his mother were very close, talking to each other every day and frequently going out to eat together.  Id. at p. 2796.  Kari had been divorced from Nick's father for Nick's whole life, so Kari raised Nick.  Id. at p. 2797.  Nick saw his mom at the Friday night pizza gathering on March 14.  Id.  Nick left the restaurant before Kari.  Id.  Nick then tried contacting Kari multiple times on Sunday, March 16.  Id. at p. 2799.  Nick's girlfriend Paetyn went to check on Kari and called Nick to tell him she had found Kari not breathing in the bathtub.  Id.  Nick then called other family members to tell them the news.  Id. at p. 2800.  Nick was the one who called the police to come back to the house after Kari's bedding and purse were discovered to be missing.  Id. at p. 2801.  He testified upon entering Kari's house he smelled some sort of cleaning product.  Id. at p. 2806.

Nick testified Kari did not have any boyfriends.  Id. at p. 2802.  She sometimes talked to an ex-boyfriend named ███████████ who she dated

13

before she married Nick's dad, but Kari and ██████ never dated during Nick's lifetime. Id. at pp. 2802-03. Nick testified Kari didn't feel comfortable with her body and so she didn't want to date. Id. at p. 2803. Nick testified Kari always left the front door unlocked so Nick could come and go from her house as he wanted. Id. at p. 2804. He never had a key to her house because the door was always unlocked. Id.

Kari's brother, Brian Johnson, testified that he and his sister were very close. Id. at p. 2829. Kari was a mother figure to Brian as their own mother died when Brian was nine. Id. at p. 2830. The house Kari was living in had been given to her by Brian after he completely remodled it. Id. at pp. 2830, 2833. Brian received a call from his nephew, Nick, around 3:30 p.m. or 4:00 p.m. in the afternoon on March 16 saying that Kari had passed away. Id. at p. 2831. Brian immediately left with his two daughters to go to Kari's house. Id.

After police allowed the family to enter Kari's house, Brian went into the bathroom and punched his fist through the drywall. Id. at p. 2833. He noticed the bathroom was weird—there were no towels or rugs in the bathroom and it smelled really clean to the point of being too clean. Id. at p. 2834. Nick, Paetyn, and Brian all testified that no family members used any cleaning products in the house once they entered. See, e.g., id. at p. 2835. Brian noticed there was no bedding on Kari's bed. Id.

Brian left as he felt there was nothing else he could do. Id. Nick called Brian and asked if he had seen Kari's purse, which he had not. Id.

Brian said he had admonished Kari in the past about her habit of not locking the door to her house, but she continued to leave it unlocked because she felt safe in that neighborhood.  Id.

Brian testified in the days after Kari's death, a police officer called and asked if Kari was a nail biter.  Id. at p. 2839.  He said she was.  Id.  At the funeral, Brian noticed Kari's nails had been cut way back beyond the quick, more so than he had ever seen her bite her nails.  Id.  He testified he didn't even think a person could bite their fingernails back that far.  Id.

David Gabriel, Kari's cousin, testified that he was at the pizza restaurant with Kari on March 14.  Id. at pp. 2846-47.  He testified that Kari suffered from frequent migraines and she was suffering from one that night.  Id. at 2848.  He and Kari and other family left the restaurant around 10 p.m.  Id. at p. 2850.

David arrived at Kari's house after Nick called to say she passed and her body had already been removed.  Id. at p. 2853.  He went into the bathroom which did not have any windows and he and his daughter remarked that it was odd that there were no towels and that it smelled like bleach.  Id. at p. 2854. David heard someone ask "where are the sheets?"  Id.  Then someone else asked "where is her purse?"  Id. at p. 2855.  He testified the hair on the back of his neck stood up.  Id.  David said no one in the house had been using any cleaning products.  Id.  David testified Kari's friends were all long-term friends that the family knew; she wouldn't go to a stranger's house without knowing that person.  Id. at p. 2861.

15

Sheila Wassom, Kari's best friend and cousin, testified. Id. at 2863. Sheila testified she knew Kari her whole life, but they were best friends for the last twenty years. Id. at p. 2864. Sheila and Kari got together at Kari's house once or twice a week and both women were regulars at the Friday night pizza gatherings. Id. The two women talked about everything; there was no topic that was off limits, and Kari was an "open book" to Sheila. Id. at pp. 2864-65. Kari never had a boyfriend in the twenty years that she and Sheila were best friends. Id. Kari was not sexually active either. Id. at p. 2866. Sheila testified Kari would never engage in a one-night stand. Id. at pp. 2866-67. Sheila testified Kari had gotten on a dating website once, but got off it because she didn't feel comfortable. Id. at p. 2868.

Sheila agreed that Kari's old boyfriend ████████████ lived over the top of a bar Kari sometimes went to, but Kari didn't drink. Id. at p. 2872. Sheila also agreed that Kari's ex-husband, ████████████, would sometimes call her up and offer to have sex with her. Id. at p. 2873. Sheila said Kari would hang up on ████. Id.

Sheila went to Kari's house on March 16 after hearing that she had passed. Id. In the bedroom, Sheila noticed cigarette butts under the night stand and a pill bottle turned over and aspirin on the floor spilled. Id. at p. 2874. Sheila found this odd because Kari kept a neat house and would never have cigarette butts on the floor. Id. Sheila noted a strong odor of cleaning solution in the bathroom at Kari's house the day she died. Id. at p. 2877.

16

Ross Plucker, a cousin-in-law of Kari's, testified that he and his wife went to Kari's house the day she died.  Id. at pp. 2879-81.  He noticed an overwhelming odor of bleach or cleaning solution.  Id. at p. 2881.  He also noticed there were no sheets on the bed, there were cigarette butts under the nightstand, and the blinds in the bedroom were all in disarray.  Id.  He also noticed the bathroom was empty.  Id. at p. 2882.  He found this strange as a woman taking a bath would have had a towel, a robe, or her pajamas nearby. Id.  There were also no rugs on the bathroom floor or decorations on the walls. Id.  Ross checked the laundry machines and the inside of Kari's car looking for the missing items.  Id.  Others noticed Kari's purse and car keys were missing. Id. at p. 2884.  No one in the house was used cleaning supplies.  Id.  Ross advised Nick to call the police again, which he did.  Id. at p. 2885.

Peggy Reed, one of Kari's best friends since 2007, testified that Kari was a smoker.  Id. at p. 2933 (JTT Vol. 7).  Peggy was aware of Kari's sexual activity and testified that from 2007 to 2015, Kari had slept with ███████████ once.  Id. at p. 2934.  Afterward, Kari cried and cried to Peggy, saying she felt used by him.  Id.  She was a very conservative mom who did not go out and meet men and have sex.  Id.  She had other men she talked to, but did not sleep with or date.  Id. at pp. 2934-35.  Kari slept with ██████ only one time. Id. at p. 2940.

### ii.    Police And First Responders

Detective Pat Mertes of the SFPD testified.  Id. at p. 2944 (JTT Vol. 7). Det. Mertes was a patrol officer on March 16, 2015, and was dispatched to

17

Kari's house at approximately 5:00 p.m. after a report of a possible cardiac event and drowning. Id. at p. 2945. Det. Mertes was the first officer to arrive on scene and met with Paetyn Haemze. Id. at p. 2946.

He described Kari's home as a one-level 800 square-foot home with a detached garage. Id. He described Kari's home as facing an elementary school to the east with her driveway being on the north side of her property and the detached garage in the back northwest corner of the lot. Id. There was a mosque immediately to the north of Kari's house and then 15th Street went east/west on the north side of the mosque. Id.

Det. Mertes entered the house through the front door and followed the sound of running water back to the bathroom where he saw Kari's body in the bathtub curled up into the fetal position facing him. Id. at 2950. Det. Mertes shut off the water, both the hot water tap and the cold tap. Id. He then touched Kari to see if she was alive and ascertained she was dead. Id. at p. 2951. The water had not been overflowing the tub as the overflow drain at the top of the tub was able to keep up with the rate of water flowing into the tub. Id.

After firefighters and EMTs arrived, Det. Mertes looked around the house for signs of anything out of the ordinary or signs of disturbance. Id. at pp. 2960-61. Seeing none, Det. Mertes left the scene. Id. at p. 2961.

Det. Mertes went back out to Kari's house after Nick called dispatch around 7:00 p.m. with questions and concerns. Id. at p. 2962. At that time, Det. Mertes asked the family to exit the house. Id. Other officers began to

18

arrive and family members were interviewed and the neighbors canvassed.  Id. at p. 2963.  In the days following Kari's death, Det. Mertes began checking storm drains; on March 19 he found some underwear, on March 25, he found an icecream-type plastic pail that had a bottle with a chemical substance in it. Id. at p. 2965.  On March 26, Det. Mertes found a plastic grocery sack tied up tight which, upon opening, was found to contain semi-transparent latex gloves and a used condom and condom wrapper.  Id. at pp. 2965-66.  These were found on railroad tracks approximately six to eight blocks north of Kari's house.  Id.

On cross-examination Det. Mertes admitted he had not smelled any odor of bleach or chemicals upon entering Kari's house the first time.  Id. at p. 2969. When he returned to the house the second time on March 16, he initially did not smell bleach or chemicals either, but later on he noticed the smell.  Id. at p. 2970.  Det. Mertes quizzed Nick as to whether any of the family had been cleaning and he said no one had.  Id. at p. 2971.  Det. Mertes testified he smelled the bleach smell after the tub had been drained and Kari's body removed.  Id. at p. 2973.

Sergeant Troy Bruxvoort of the SFPD testified he also reported to Kari's house around 5:00 p.m. on March 16.  Id. at p. 2978.  Det. Mertes described to Sgt. Bruxvoort what he had seen inside the home.  Id. at pp. 2979-81.  Sgt. Bruxvoort entered the home and took photographs of the entryway, the first entrance of the house, the bathroom, the body inside the tub, the sink, the kitchen, the counter, the refrigerator, and pictures of the body once it was

removed from the tub and was being placed into the body bag.  Id.  Upon entering the home, he noticed the kitchen and living room area were very neat and tidy.  Id.  Sgt. Bruxvoort then left the scene after Kari's body was removed by ambulance personnel.  Id.

Less than an hour later, Sgt. Bruxvoort returned to the scene after Det. Mertes called him and told him about a phone call from Kari's son, Nick, about some suspicious circumstances.  Id. at p. 2983.  Sgt. Bruxvoort in turn summoned Detective Martin Hoffman and the crime lab person, Officer Mark Toft, to the scene.  Id.  Upon arrival, Det. Mertes explained to Sgt. Bruxvoort and Det. Hoffman the suspicious things the family had noticed.  Id.  Sgt. Bruxvoort then entered the house a second time and this time smelled a strong odor of chemicals, possibly bleach.  Id. at p. 2984.  He testified the odor was of sufficient intensity one didn't even have to go back to the bathroom to smell it, but it was evident from the moment he walked into the house.  Id. at p. 2985.

Matt Hardwick, a paramedic who responded to the scene on March 16, testified he observed Kari's body face-down in the small tub and some skin had sloughed off and was floating on the water in the tub.  Id. at pp. 2988-91.  He and other emergency responders decided to remove the body without draining the water to leave the skin in the water for the crime scene to investigate.  Id. at p. 2991.

They had initially decided to removed the body from the tub and place it on towels on the floor, but then noticed there were no towels anywhere in the bathroom, there was no rug on the floor—there was nothing that could be used

to dry the body off.  Id.  Mr. Hardwick also testified there was nothing in the bathroom to show Kari had taken a bath—there were no clothes laying on the floor that she had taken off, there were no clothes in the hallway, there were no towels hanging for her to use when she got out of the bathtub.  Id. at p. 2992.

Instead of towels, Kari's body was laid onto a body bag after it was removed from the tub and Mr. Hardwick sealed the bag up.  Id. at pp. 2992-93. Later that night, Det. Burns called Mr. Hardwick and asked him about his observations regarding the state of the bathroom and he told the detective about the absence of any towels.  Id. at p. 2993.  Mr. Hardwick did not notice the smell of any chemicals when he was at the scene.  Id. at p. 2995.

Officer Michelle Deschepper of the SFPD testified she was dispatched to Kari's home at approximately 7:00 p.m. on March 16.  Id. at pp. 2998-99. Upon arrival, Det. Mertes directed Officer Deschepper to go to the mosque next door to the north of Kari's house to see if there was any surveillance video.  Id. at p. 3000.  She met with Abdi Haji at the mosque, who affirmed they did have surveillance video.  Id.

Mr. Haji showed Officer Deschepper how to operate the equipment and she began watching surveillance video footage from Friday night, March 14 beginning at about 8:00 p.m. on that night.  Id. at 3000-01.  She watched all the surveillance footage until Sunday, March 16 at approximately 5:00 p.m. as that was the time officers first arrived at Kari's house.  Id. at p. 3001.  The camera angle Officer Deschepper watched was pointed to the south and east and captured Kari's front lawn and driveway.  Id.

Officer Deschepper saw Kari's vehicle arrive in her driveway and park at approximately 10:00 p.m. on March 14. Id. at p. 3002. On Saturday, March 15 at approximately 2:33 a.m. she saw a male individual walk across the street in front of the mosque wearing a light grey hoodie with the hood up with a plaid flannel jacket, jeans, dark shoes, and carrying something shiny in their hands that could have been a set of keys. Id. Shortly after the man crossed the street, Kari's vehicle exited her driveway travelling north on her street with no headlights on. Id. At 3:33 a.m., Kari's vehicle returned with the headlights off traveling southbound on Kari's street. Id. at pp. 3002-03. The vehicle passed by Kari's driveway and then pulled back into her driveway. Id. at p. 3003. The video from the front of the mosque did not show who was driving Kari's vehicle or whether anyone aside from the driver was in the vehicle. Id. at p. 3005.

Detective Shellie Slattery of the SFPD testified she was assigned to investigate Kari's death on the morning of March 17, 2015, by interviewing Kari's family and friends and reviewing surveillance video footage from the pizza restaurant from Friday night, March 14. Id. at pp. 3007-08, 3012. The restaurant footage showed Kari arriving at 6:50 p.m. on March 14 wearing black pants, a black and white shirt, and a black and white coat. Id. at p. 3013. Det. Slattery's interviews revealed Kari had an on-again, off-again sexual relationship with her ex-husband, ████, that she also had had an intimate relationship with ████████, and that she had had drinks on a

couple of occasions with ███, a handyman.  Id. at pp. 3013-39.  The interviews also indicated she had signed up for a six-month trial of a dating website.  Id.

Detective Scott Timmerman of the SFPD testified that he had been asked to help with the investigation into Kari's death on March 18, 2015.  Id. at pp. 3039-41.  A resident had said that there was some trash in his septic hole that he had put out for collection on Monday that wasn't his, so Det. Timmerman and two others reported to the landfill to see if the garbage was related to Kari's death.  Id. at p. 3041.  They found a number of pairs of black pants as well as some bathroom rugs which they took into evidence.  Id. at p. 3042.

Sergeant Jessica Speckmeier of the SFPD testified that she was assigned to assist in investigating Kari's death on March 19, 2015.  Id. at pp. 3044-45. Sgt. Speckmeier investigated ████████████████████████ as possible suspects and was able to eliminate each person because their whereabouts during Kari's murder were confirmed to be elsewhere.  Id. at pp. 3045-48.  Sgt. Speckmeier also compared Kari's phone records and Mr. Kryger's phone records and discovered that they had never contacted each other using their phones by either calling, texting or emailing.  Id. at pp. 3049-50.  There were not even any common phone numbers between the two.  Id.

Sgt. Speckmeier also sent off swabs from inside Kari's vehicle to be tested for DNA.  Id. at p. 3051.  Mr. Kadi introduced into evidence an exhibit during cross-examination showing the results of that testing, none of which matched Mr. Kryger.  Id. at p. 3053.

### iii.    Further Police Investigation

Detective Timothy Bakke of the SFPD testified he was asked at 9:00 p.m. on March 16 to assist in the investigation of Kari's death.  Id. at pp. 3070-71. He arrived at Kari's house and spoke to Det. Hoffman and Det. Mertes before doing a walkthrough of Kari's house.  Id. at p. 3072.  Det. Bakke noticed the blind over the window in Kari's room had some pieces missing that allowed persons from outside to see into the bedroom.  Id. at p. 3073.  The damage to the blinds did not appear to be new as the missing pieces were on the floor immediately below the window and they were covered with dust.  Id.  Det. Bakke went outside and confirmed he could see into Kari's bedroom through the damaged blinds.  Id.  Outside, Det. Bakke found a footprint in the ground directly beneath the place where the blinds were compromised.  Id. at p. 3074. An impression of the footprint was taken.  Id.

Inside Kari's house, Det. Bakke observed some bleach spots on the carpet in between the bathroom and the bedroom.  Id. at p. 2357 (JTT Vol. 8). Some spots were also observed on Kari's bed near the foot of the bed.  Id.

The next day detectives including Det. Bakke learned that the autopsy of Kari concluded the cause of her death was strangulation and the manner of her death was homicide.  Id. at p. 3075 (JTT Vol. 7).  Det. Bakke and others began collecting surveillance videos from the mosque next to Kari's house and from other businesses near her house.  Id.  There were two different views of videos from the mosque and both were played for the jury.  Id. at p. 3079.

24

The first video was the one facing south and east toward Kari's driveway that had previously been described by Officer Deschepper.  Id. at p. 3080. Det. Bakke described the video as it played and testified that a bicycle traveled from the south going north on the street in front of Kari's house at approximately 11:30 p.m. on March 14.  Id. at pp. 3081; id. at p. 2348 (JTT Vol. 8).  The bicycle disappeared off the right side of the screen then reappeared traveling to the south this time on the sidewalk and slowed in front of Kari's house.  Id. at p. 3081 (JTT Vol. 7).

At 2:31 a.m. the bicycle came back into view from the south heading north, crossing the front lawn of the mosque.  Id. at p. 3082; id. at p. 2350 (JTT Vol. 8).  In other words, the bike passed by Kari's house heading north on the street, then turned around 180 degrees and came back by Kari's house again on the sidewalk heading south and slowing by Kari's house.  Then the bike appeared again approximately three hours later heading west.

Once the bicycle left the video frame, the video switched to show the second video surveillance view from the back side of the mosque.  Id. at p. 3082 (JTT Vol. 7).  At about 2:30 a.m. on March 15 the person rode his bike around the mosque to the back and parked the bicycle in back of the mosque. Id. at pp. 3082-83; id. at p. 2349 (JTT Vol. 8).  From the back side of the mosque there was a pathway accessible to Kari's house.  Id. at p. 3083 (JTT Vol. 7).  A few moments after the bicycle parked in back of the mosque, Kari's vehicle was backed out of the driveway with its lights out.  Id.  The vehicle headed north on the street in front of Kari's house, turned west at the corner

25

by the mosque, pulled into the mosque parking lot, backed out of the mosque lot, then turned south and traveled south on the street parallel to Kari's street one block west of her street. Id. at pp. 3083-84; id. at p. 2355 (JTT Vol. 8). The dome light was on in Kari's vehicle when the vehicle was in the mosque parking lot and it appeared the driver was the same person as the one who had walked in front of the mosque moments before. Id. at p. 3084 (JTT Vol. 7).

An hour later, Kari's vehicle re-entered the mosque video traveling north on the street in front of her house. Id. at p. 3085. The vehicle overshot Kari's driveway and had to turn into the parking lot of the elementary school to turn around and then parked in Kari's driveway. Id. After Kari's vehicle was parked in the driveway, the same suspect was seen walking from the direction of Kari's house to the back side of the mosque once more. Id. A glint of the reflector of the bicycle could then be seen as the bike headed west. Id.

Det. Bakke believed the suspect seen in the video was the person who murdered and raped Kari. Id. at p. 3086. Police then released portions of the video and still images from the video to the media, asking the public to assist the police in identifying the man in the images. Id. at p. 3087. Following the publication of the images from the mosque video, police received multiple contacts from different individuals who identified the man in the video as Mr. Kryger. Id. at p. 3090.

Det. Bakke then interviewed people who knew Mr. Kryger, including an ex-girlfriend, Jeanette Gaul. Id. Det. Bakke also assisted in interviewing

26

Mr. Kryger and in excuting a search warrant on Mr. Kryger's person. Id. at 3090-91.

On cross-examination Det. Bakke agreed the houses in Kari's neighborhood were very close together and that no neighbor reported hearing anyone scream on the night of the murder. Id. at p. 2352 (JTT Vol. 8). Det. Bakke agreed that Kari had been trying to lose weight and had tried to access a dating site. Id. at pp. 2358-59. Det. Bakke agreed that ███████ ████████████████████████████ had had sexual relations with Kari at times. Id. at pp. 2359-61. Det. Bakke agreed that a large number of Kari's family members had access to the crime scene before police realized a crime had been committed and that, in the usual circumstance, crime scenes are sealed off to prevent tampering with or disturbing evidence. Id. at p. 2362.

On redirect, Det. Bakke clarified that Kari's contacts with both ███████ ████████████████████████ had not been recent contacts. Id. at p. 2366.

Captain Terry Mixell of the SFPD testified that he was involved in the investigation of Kari's death by watching surveillance video from Paradise Casino and Family Market, both of which were located nearby to Kari's house and to the house of Lori Nagel, Mr. Kryger's girlfriend. Id. at pp. 2474-78 (JTT Vol. 8). Cap. Mixell found nothing of evidentiary value on the casino video. Id. at p. 2479.

The Family Market video had three cameras with different angles, one of which showed Ms. Nagel's residence. Id. at p. 2480. Cap. Mixell observed an individual walking westbound at 4:35 a.m. on March 15 and then at 4:36 a.m.,

27

the lights at Ms. Nagel's house were turned on.  <u>Id.</u> at pp. 2480-81.  At 4:52

a.m. someone walked north to Ms. Nagel's house.  <u>Id.</u> at p. 2481.  A few

minutes before 7:00 a.m., a person walked from Ms. Nagel's house to the north

side of the Family Market.  <u>Id.</u>

On March 28, 2015, Capt. Mixell was in the vicinity of Family Market

and drove over to that location because it was bothering him why this person

went back to Family Market.  <u>Id.</u> at p. 2482.  He discovered two dumpsters and

a trailer parked where the person had walked to.  <u>Id.</u>  Cap. Mixell found a

garbage sack that was tied shut that had snow on top of it.  <u>Id.</u>  When he tore

the sack open, he saw floral bedding, so he did not touch it further and called

the on-duty supervisor sergeant and the crime lab so it could be collected.  <u>Id.</u>

at p. 2483.  When other officers arrived, Cap. Mixell left the scene.  <u>Id.</u>

Andrea Kelly, formerly a detective with the SFPD, testified she assisted

with the investigation of Kari's death.  <u>Id.</u> at pp. 915-16 (JTT Vol. 9).  She

obtained the computer from the mosque and watched the video that was stored

on it.  <u>Id.</u> at p. 917.  She also obtained videos from other locations and

reviewed them.  <u>Id.</u>  Two of the videos she watched were from a pharmacy on

the corner of 12th Street and Kiwanis Avenue, and from a gas station just off of

that corner.  <u>Id.</u> at pp. 918-19.  The corner was about three blocks north and

one block east of Kari's house.  <u>Id.</u> at p. 919.  The corner was one block to the

south and one block to the west of Ms. Nagel's house.  <u>Id.</u> at pp. 919-20.

She watched other videos from a gas station on the corner of 12th Street

and West Street, a video from a pharmacy on the corner of Louise Avenue and

41st Street, a video from a dollar store on the corner of 12th Street and
Kiwanis Avenue, a video from a McDonald's restaurant just east of the
intersection of 12th Street and Kiwanis.  Id. at pp. 919-21.  Det. Kelly did not
observe anything of note.  Id. at p. 922.

Once detectives had learned that bedding was missing, Det. Jason
Montgomery testified they began checking dumpsters of nearby businesses
trying to locate the bedding.  Id. at p. 938.  By March 20, police had considered
Mr. Kryger to be a possible suspect.  Id. at p. 939.  Det. Montgomery
participated in the execution of a search warrant at Mr. Kryger's home.  Id.
That search located multiple stocking hats and multiple pairs of gloves.  Id. at
p. 940.

On cross-examination, Det. Montgomery testified that although police
had found bedding in dumpsters and in burn sites, they could not link that
bedding with the missing bedding from Kari's house.  Id. at p. 946.  Also on
cross-examination, Det. Montgomery testified he interviewed ████
████ girlfriend, who said that █████ was madly in love with Kari and
there had been a relationship between the two in the past.  Id. at p. 952.  On
redirect, Det. Montgomery also testified that the most recent contact between
█████ and Kari had been two years before Kari's death according to the
girlfriend.  Id. at p. 955.  The girlfriend also related that ██████ did not have
a violent bone in his body and would not have been capable of raping and
murdering.  Id.

29

Officer Mark Toft went to Kari's residence to further document the investigation.  Id. at p. 979.  While there, he collected a bottle of shampoo and conditioner from the tub, the two cigarette butts from under the bedside table in Kari's bedroom, and a tissue from the top of her dresser.  Id. at pp. 979-81. He photographed the cleaners under the bathroom sink which included glass cleaner and some all-purpose cleaners.  Id. at p. 982.  Officer Toft collected a half-empty can of Diet Mountain Dew from the dresser.  Id. at p. 983.

On March 20, Officer Toft documented the search of Mr. Kryger's body, pursuant to a warrant, including scratch marks and bruises on his chest and left biceps.  Id. at pp. 995-96.  It appeared Mr. Kryger had recently shaved his pubic area when the search occurred.  Id. at p. 996.  A DNA sample was taken from Mr. Kryger on this occasion.  Id. at p. 997.  The tread on the shoes Mr. Kryger was wearing at the time of the search appeared to Officer Toft to be very similar to the shoe impression found outside Kari's bedroom window.  Id. at p. 998.  Officer Toft collected a Timex watch, a white Bic lighter, and sunglasses. Id. at p. 999.  Mr. Kryger's wallet was taken into evidence, containing $27.99 in cash, one condom and an ID card.  Id. at p. 1014.

On March 20, Officer Dott collected two bicycles from a maintenance garage on East 10th Street where Mr. Kryger was employed.  Id. at p. 1036. The two bikes were a blue Huffy Ironman with white reflectors on each wheel and the handlebars and the other was a red, black, and grey Mongoose XA 75 mountain bike.  Id. at p. 1037.  The red bike was missing the pedals.  Id. at

p. 1125. A search warrant was executed at the same location and there was a closet full of several items of cleaning supplies and chemicals. Id. at 1037-38.

Officer Rene Velasquez with the SFPD testified that she was instructed to go over to Redwood Estates and look in their maintenance shed for a couple of bicycles. Id. at pp. 1119, 1124. While she was there, she saw a bundle of blue sheets inside the locked office inside the maintenance shed. Id. at p. 1127. A search warrant was applied for, obtained, and other officers came and executed the search warrant. Id.

Det. Robert Forster of the SFPD testified that, based on CrimeStoppers tips the police had received, he was tasked with finding Mr. Kryger and speaking to him as well as other individuals. Id. at pp. 1134-39 (JTT Vol. 10). Det. Forster went to Mr. Kryger's mother's house where he was living, but when no one answered his knock, he called Mr. Kryger's cell phone number which Det. Forster had obtained from Mr. Kryger's parole officer. Id. at p. 1139. Mr. Kryger came to Det. Forster's location and part of their discussion took place inside Det. Forster's vehicle where it was recorded. Id. at pp. 1139-40. The recording of the interview was played for the jury. Id. at p. 1141.

Det. Forster testified that while Mr. Kryger was speaking with him, his chest was beating rapidly, his jugular vein was visibly pulsating in his neck, and he began to sweat profusely. Id. at p. 1142. Mr. Kryger told Det. Forster about purchasing an engagement ring at Walmart for Ms. Nagel. Id. Det. Forster followed up on that information by contacting the Walmart identified by Mr. Kryger. Id. Mr. Kryger had purchased a ring, a cell phone,

31

and a calling plan at Walmart, and the total of all three items was $171.  Id. at

p. 1144.  Det. Forster followed up on a number of other potential suspects, but

all were eliminated because they could not be placed near Kari's residence on

the night of the murder.  Id. at pp. 1144-45.

Mr. Kadi made a motion for a mistrial based on Det. Forster's mention of

the fact that Mr. Kryger had a parole officer.  Id. at p. 1146.  The court took the

motion under advisement at that time, stating that it wanted to wait until it

had the full picture of what the "quantum, quality, and state of [the] evidence"

was in the case before making a decision.  Id. at p. 1150.  The court offered to

give the jury an instruction to disregard the evidence, but Mr. Kadi demurred,

saying it would tend to remind the jury of the testimony all over again.  Id. at

p. 1151.  The court determined to give the instruction.  Id. at p. 1152.

When the jury was brought back into the courtroom, the court instructed

it as follows:

> Ladies and gentlemen, you are instructed—I am giving you an
> instruction at this point.  You are instructed to disregard Detective
> Forster's testimony concerning the source of his knowledge of
> Mr. Kryger's telephone number.  I have stricken his testimony and
> you may not consider it.  You may consider other aspects of
> Detective Forster's testimony if you choose to do so.

Id. at pp. 1154-55.

On cross-examination, Det. Forster testified he had interviewed Michael

Miller and showed him photos of the blue and the red bikes seized by police.

Id. at pp. 1159-61.  Mr. Miller told Det. Forster he remembered Mr. Kryger's

bike as being black, not red or blue, and that it did not have any stickers on it.

Id.  Mr. Kryger's red bike had stickers on it.  Id.

32

Outside the presence of the jury, Mr. Kadi made an offer of proof by examining Det. Forster.  Id. at p. 1075 (JTT Vol. 9).  The purpose of the offer of proof was to show that the police investigation lacked credibility and good faith. Id.  Specifically, Mr. Kadi sought to elicit testimony that one of the suspects Det. Forster investigated was ███████████.  Id. at pp. 1175-83 (JTT Vol. 10) ███████ was a registered sex offender, who liked consensual sex combined with a choking fetish, and whose estranged ex-girlfriend told Det. Forster had had contact with a woman named Kari.  Id.  When Mr. Kadi initially sought to elicit this testimony during the trial in front of the jury, the prosecution objected based on hearsay and the court sustained the objection. Id. at p. 1184.  The court, after hearing the proffer, sustained the objection, but changed the basis of his ruling to relevancy.  Id. at p. 1185.

### iv.    Lay Witnesses From the Community

The court heard testimony from Jeanette Gaul outside the presence of the jury.  Id. at p. 2388 (JTT Vol. 8).  Ms. Gaul testified to the court she had been in a relationship with Mr. Kryger in 2008 that included a sexual relationship and becoming engaged to be married to him.  Id.  She stated that Mr. Kryger kept his body clean and meticulous, keeping his hair short on his head andin his pubic area.  Id. at pp. 2388-89.  Ms. Gaul testified that Mr. Kryger told her he kept his hair short so that he did not leave DNA anywhere. Id. at p. 2389.  The state was not allowed to present this testimony to the jury. After this testimony outside the presence of the jury, Ms. Gaul was called as a witness in front of the jury.  Id. at p. 2400.

33

Ms. Gaul testified that she had known Mr. Kryger for several years and was once in a relationship with him. Id. at p. 2401. In March 2015, when Ms. Gaul and Mr. Kryger were no longer dating, police contacted Ms. Gaul. Id. Ms. Gaul agreed to go to the police station and watch some video surveillance footage. Id. She recognized the man in the video to be Mr. Kryger by the jacket he was wearing and by the manner in which he walked. Id. at p. 2402. Ms. Gaul had previously seen Mr. Kryger briefly in March 2015 and he was wearing similar clothing to what the man in the video was wearing. Id.

Michael Miller, Mr. Kryger's friend, testified that he ran into Mr. Kryger at the Hy-Vee grocery store on the corner of 10th Street and Kiwanis on Saturday morning March 15, 2015. Id. at pp. 2403-05. The two men exchanged phone numbers. Id. at p. 2405. Later on that same day, Saturday, Mr. Kryger called Mr. Miller and asked if he would give him a ride to Walmart. Id.

At Walmart, Mr. Kryger bought a ring for his soon to be fiancée, Ms. Nagel. Id. at p. 2407. Later on that day, Mr. Miller hosted Mr. Kryger at a cookout at Mr. Miller's house. Id. The day before meeting up with Mr. Kryger, on Friday, March 14, Mr. Miller had been traveling back to Sioux Falls following a trip to New York. Id. at p. 2405.

A few days after the barbeque, Mr. Miller saw the mosque video being played on the television. Id. at p. 2408. He recognized the person in the video as Mr. Kryger from his jacket and from his walk. Id. Mr. Miller called Mr. Kryger and told him "look, you're on TV." Id. Mr. Kryger admonished Mr. Miller not to be joking around like that. Id. at p. 2409. A few days later

34

Mr. Kryger told Mr. Miller he burned his jacket to get rid of it.  Id.  He also stated that he had been at Mr. Miller's house for the cookout the night of the murder, which was not true because the night of the murder Mr. Miller had been in transit from New York to Sioux Falls.  Id.

Lori Nagel, Mr. Kryger's girlfriend in March 2015 testified.  Id. at p. 2415. Ms. Nagel began dating Mr. Kryger in December 2013. At that time she lived on the same street as Kari Kirkegaard about five blocks north of Kari's house.  Id. at pp. 2416-17.  Mr. Kryger did not own a motor vehicle at that time and got himself around town on a bicycle.  Id. at p. 2417.  Ms. Nagel owned a vehicle, but she only let Mr. Kryger drive it once.  Id.  He had not driven for several years, so he was out of practice.  Id.  She testified Mr. Kryger was right-handed. Id. at p. 2418.

On the evening of Friday, March 14, 2015, Ms. Nagel was at a bar and a billiards parlor.  Id.  Mr. Kryger came to the billiards parlor and was upset that Ms. Nagel was in a bar.  Id. at p. 2419.  He grabbed Ms. Nagel's arm and asked her to go outside to talk.  Id.  Ms. Nagel's friend did not like the way Mr. Kryger grabbed Ms. Nagel and there was a confrontation between the two.  Id.  The friend and Mr. Kryger got into an altercation outside the bar, and Mr. Kryger ended up whipping his cellphone on the ground, smashing it.  Id. at p. 2420. Afterward, Mr. Kryger left the billiards parlor on his bike.  Id.  Ms. Nagel went to her home shortly afterward.  Id.

Ms. Nagel arrived home around 6:30 p.m. or 6:45 p.m. and Mr. Kryger rode up on his bike.  Id. at p. 2421.  She told him she didn't want to talk to

him at the moment.  Id.  He tried to follow Ms. Nagel into her home and she would not allow him to enter.  Id.  He got upset, turned around and walked to his bike and rode away, stating that the relationship was over.  Id.

At 3:45 a.m.[5] the next day, Saturday, March 15, Mr. Kryger called Ms. Nagel and said he wanted to talk.  Id. at p. 2422.  She allowed him to come over to her house.  Id.  Ms. Nagel noticed that when Mr. Kryger arrived at her house he was no longer wearing his blue plaid flannel jacket that he wore all the time when it was cold out.  Id. at p. 2423.  Later, Mr. Kryger told Ms. Nagel that he was riding on the bike trail and had slipped off and fell into the river, getting the jacket wet.  Id. at pp. 2423-24.  Ms. Nagel never saw the jacket again.  Id. at p. 2424.

Upon arriving at Ms. Nagel's house, Mr. Kryger disrobed and Ms. Nagel observed two fresh-looking scratches on his upper chest.  Id. at p. 2426. Mr. Kryger said he was working in the top of the garage and scratched himself on something, but there were no tears in his clothing.  Id. at p. 2427.

In the morning, Mr. Kryger offered to go to Hy-Vee and get doughnuts, pulling out a significant amount of money.  Id. at p. 2424.  This was unusual as Mr. Kryger usually did not have a lot of money to spare.  Id.  Later that day,

---

[5] Phone records documented that the phone call had actually been made at around 4:30 a.m.  The record does not indicate what phone Mr. Kryger used to call Ms. Nagel.  He had destroyed his own phone by throwing it to the ground in the early evening of March 14.  According to the Supreme Court, Mr. Kryger told detectives in his first statement that he had returned to his mother's home where he was living (Burnside Trailer Park, approximately 12-15 blocks away from Ms. Nagel's house), and washed his clothes.  State v. Kryger, 907 N.W.2d 800, 806 (S.D. 2018).  So perhaps Mr. Kryger used a landline or some other phone at his home to call Ms. Nagel.

Mr. Kryger presented Ms. Nagel with a ring and asked her to marry him.  Id. at
p. 2425.  She accepted, but said they would wait a year to get married.  Id.

On March 19 or 20, Ms. Nagel saw the mosque video of the man who
raped and murdered Kari playing on TV.  Id. at p. 2427.  She believed it was
Mr. Kryger in the video because the man in the video was dressed the same as
Mr. Kryger from head to toe, and his demeanor and distinctive walk were the
same.  Id. at p. 2428.  Ms. Nagel talked to Mr. Kryger about the video multiple
times, but he insisted it wasn't him.  Id. at pp. 2429-30.

Ms. Nagel eventually spoke to the police about her belief it was
Mr. Kryger in the video and she showed police a photo of Mr. Kryger on her
phone.  Id. at p. 2430.

On May 12, 2015, Ms. Nagel spoke to Mr. Kryger on the phone.  Id. at
p. 2432.  The phone call was recorded and played for the jury.  Id. at pp. 2432-
33.  In the phone call Mr. Kryger confessed to Ms. Nagel that he had had sex
with Kari, but he told Ms. Nagel it was consensual, not rape.  Id. at pp. 1295-
96 (JTT Vol. 11).

Richard Foster, Mr. Kryger's uncle, testified.  Id. at p. 2451 (JTT Vol. 8).
Mr. Foster was a handyman and Mr. Kryger worked with him in March 2015.
Id. at p. 2452.  At the time, Mr. Foster paid Mr. Kryger $10.00 per hour and
Mr. Kryger earned approximately $200 per week.  Id. at p. 2453.  Mr. Foster
was contacted by police about the mosque video and Mr. Foster told them it
looked like Mr. Kryger in the video because of the walk that he had.  Id.  The
next day Mr. Foster called the police back and said it didn't look like Mr. Kryger

in the video.  Id.  At trial, Mr. Foster testified the man in the mosque video was considerably heavier than his nephew, Mr. Kryger.  Id.  Also, although Mr. Foster testified that Mr. Kryger had a plaid flannel jacket like the one in the video, he also had numerous other jackets which he alternated wearing.  Id.

Mr. Kryger told Mr. Foster he had gotten some injuries to his arm or back while climbing over some rafters to get into the garage, but Mr. Foster never saw the injuries.  Id. at pp. 2454, 2457.  Mr. Foster testified that Mr. Kryger got himself around town by bicycle or by walking.  Id.

Kevin Kidd testified that he was a bartender and manager at a billiards parlor in March 2015.  Id. at p. 2459.  He testified there was video camera surveillance footage from the parlor in March 2015 which he was asked to provide to police.  Id. at p. 2460.  The video of the confrontation between Ms. Nagel's friend and Mr. Kryger from the evening of March 14 was played for the jury.  Id. at p. 2464.

Bob Menke, an employee at Pride Neon Signs (a family business), testified that to the west of Pride there is a bank of trees and a depression where Mr. Menke noticed someone had built a fire.  Id. at pp. 2484-86 (JTT Vol. 8).  Mr. Menke testified they have had trouble with this area before with people dumping litter and deer carcasses and the like, so he monitors the area from time to time.  Id. at p. 2487.  Mr. Menke noticed that there was fabric in the fire area and no beer cans around the fire like there had been in the past when people partied there, so he called the police.  Id.  Mr. Menke made his report on March 25 and he believed he had last checked the area two weeks

previous (which would have been March 11), and there had been no evidence of the fire at that time, so he testified he believed the fire had been set sometime in the two weeks before his discovering it on March 25.  Id. at p. 2488.

Officer Chad Winkel of the SFPD testified he contacted Bob Menke after Mr. Menke made his report.  Id. at pp. 2489-90.  Upon arrival, Officer Winkel was directed to a burned-out charred area in the woods directly to the west of Pride Neon Signs.  Id. at p. 2490.  Officer Winkel took photos and other officers collected items from the fire site.  Id.

Mark Sundvold, vice-president of operations for Service First Federal Credit Union, testified that police contacted him and asked if Mr. Kryger was one of their customers.  Id. at pp. 924-26 (JTT Vol. 9).  Mr. Sundvold confirmed he was.  Id.  Police asked Mr. Sundvold to review security footage to see if Mr. Kryger had been in the bank and Mr. Sundvold found footage of Mr. Kryger entering the bank once on February 22 and once on March 15, 2015.  Id. at p. 927.  Both times Mr. Kryger cashed a check for $102.04 and then withdrew $100 in cash.  Id. at p. 928.  Video clips of Mr. Kryger entering the bank on these two occasions were introduced into evidence.  Id. at p. 929.

Mr. Sundvold knew the person depicted in the video was Mr. Kryger because the time stamps on the video matched the time stamps generated by the teller who assisted Mr. Kryger with his transactions on each visit.  Id. at p. 931.  The bank at which Mr. Kryger conducted these transactions was located on West 10th Street.  Id. at p. 928.

39

Perry Eckhoff, an employee of the City of Sioux Falls water utility office, testified. Id. at p. 2891 (JTT Vol. 6). Based on the water meter readings from Kari's house, the witness testified that the water was turned on sometime between 7:00 p.m. on March 14 and 7:00 a.m. on March 15 and it ran continuously until sometime on Sunday, March 16, at which time the water was turned off. Id. at p. 2896.

### v.    Scientific Witnesses

Detective Derek Kuchenreuther of the Minnehaha County Sheriff's Office testified that the SFPD asked him to assist with some technical aspects of the investigation into Kari's death. Id. at pp. 2464-66 (JTT Vol. 8). He requested call logs of Kari's cellphone from January through her date of death on March 14, 2015, and found nothing of evidentiary value. Id. at pp. 2466-67. Det. Kuchenreuther was also provided with Kari's laptop, which he forensically searched, including her email records. Id. at p. 2467. Nothing of evidentiary value was found there either. Id.

Det. Kuchenreuther located two dating website with Kari's profiles and Kari's Facebook page. Id. at p. 2468. A man from Pipestone had "liked" Kari, and in a photo he was wearing clothing similar to the individual observed in the mosque video. Id. Det. Kuchenreuther handed off that lead to Det. Speckmeier with the SFPD. Id. There did not appear to be any communication between Kari and the man in the photo. Id. at p. 2469. In none of Kari's online communications did she ever give anyone her address or phone number. Id.

Det. Kuchenreuther also did a forensic examination of Ms. Nagel's phone. Id. On Ms. Nagel's phone, Det. Kuchenreuther found two photos of Mr. Kryger, one from February and one from March 2015. Id. at p. 2470. In both photos Mr. Kryer was wearing a black stocking cap, a flannel coat, and a hooded sweatshirt underneath. Id. Det. Kuchenreuther also viewed the mosque video and testified that the individual depicted in that video was wearing clothing similar to the photos of Mr. Kryger taken from his girlfriend's cell phone. Id. at p. 2472.

Detective Jason Montgomery of the SFPD testified he helped investigate Kari's death by examining Kari's cellphone and computer. Id. at pp. 932-34 (JTT Vol. 9). The last text sent from Kari's phone was to Ashley at 7:30 p.m. on March 14 referencing the family pizza dinner. Id. at p. 934. Photos were retrieved from Kari's phone showing that her bedding was blue and white in color. Id. at p. 935. Kari had had no recent contact on her phone with ████████ ████████████████████████████.[6] Id. at p. 937.

Officer Brad Johnson, the manager of the SFPD crime lab, testified he collected DNA samples and fingerprints from ████████████████████ ██████████████████ in connection with investigating Kari's death. Id. at pp. 956-58.

Officer Marc Toft, also with the SFPD crime lab, testified he reported to Kari's house about 7:30 p.m. on March 16 and took photos of the inside and

---

[6] ████████ was a handyman at Kari's prior residence in the trailer court and that there had been testimony the two were friendly with each other. Id. at pp. 1265 (JTT Vol. 10).

outside the house, including the shoe impression below her bedroom window and the garage out back. Id. at pp. 961-63. Officer Toft testified he smelled a strong odor of bleach when photographing Kari's bathroom, but in all the exploring he did of her house taking pictures, he never saw anything that would explain the smell. Id. at p. 975.

The next day, Officer Toft assisted with the autopsy on Kari's body and took photos of Kari's body as the autopsy was conducted. Id. at p. 977. He noticed that Kari's fingernails appeared to be very short and jagged or rough. Id. at p. 978. Officer Toft took into evidence a rape kit that had been collected from Kari's body. Id. at p. 990.

Officer Toft testified he had conducted a Siemens Hemastix test on the light-colored stains on the carpet outside the bathroom of Kari's house and the test was presumptive positive for the presence of blood. Id. at p. 1005.

Officer Ryan Dott, a forensic specialist for the SFPD, testified he also attended the autopsy on Kari's body on March 17. Id. at pp. 1021-22. He also collected Kari's vehicle and brought it to the police department's secure storage area. Id. at p. 1023. He helped process the vehicle and took into evidence a Coke Zero can from the center console of the vehicle that contained some cigarette butts. Id. at p. 1035.

Officer Jessica Lighty, a forensic specialist with the SFPD, testified she assisted with the execution of the search warrant at Mr. Kryger's home on March 20. Id. at pp. 1047-48. Officer Lighty photographed the inside and outside of Mr. Kryger's house. Id. at p. 1048. Several pairs of gloves, hats,

clothing, bicycle pedals, and latex gloves were collected at Mr. Kryger's house. Id. at p. 1050.

Officer Jacquelyn Wynia, a forensic specialist with the SFPD, testified her job is to examine fingerprints and analyze them to see if they are sufficient for comparison. Id. at pp. 1052-54. Officer Wynia compared some latent prints obtained from Kari's bathroom and her vehicle, but none of the prints matched Mr. Kryger. Id. at pp. 1054-57.

Officer Wynia also processed the contents from the burn pit that had been discovered near Pride Neon Signs. Id. at p. 1057. Officer Wynia found a folded $1 bill and twelve cigarette butts from the burn pit, as well as a bit of black cloth and a purple toothbrush a short distance from the burned area. Id. at pp. 1057, 1062.

Dr. Kenneth Snell, the Minnehaha County coroner and a forensic pathologist, testified he performed the autopsy on Kari's body. Id. at pp. 1066-73. Dr. Snell noted several injuries on the outside of Kari's body. Id. at p. 1076. She had a 3/4-inch wide ligature furrow across her neck consisting of two parallel lines, red in color with a clear portion in the middle. Id. Her entire face had "petechial" hemorrhages, which are small blood vessels rupturing in the face creating little red dots. Id. at p. 1077. These hemorrhages were on Kari's face, the whites of her eyes, and the soft tissue around her eye, as well as the inside of the upper and lower lips. Id. at pp. 1077-78.

Petechial hemorrhages are caused when blood draining away from an area is blocked. Id. at p. 1093. So, in Kari's case, the red marks on her neck

43

meant that blood from her head was not able to drain, which caused the breaking or rupturing of the small blood vessels in her face, causing the petechia.  Id.

Kari's hyoid bone in her neck was fractured and had heamorrhaged, and her thyroid cartilage had been fractured and hemorrhaged as well.  Id. at pp. 1078-79.

On the left occipital area of Kari's scalp there was a two-centimeter hemorrhage.  Id. at p. 1079.  On her left cheek there waa a 1/4-inch red curved mark.  Id. at p. 1080.  There were two red abrasions 4 1/2  inches in length and separated by 3/8 of an inch on her left posterior shoulder.  Id.  Just below that were two sets of parallel red abrasions.  Id.  She had a set of red/brown abrasions on her posterior right shoulder that were 3 1/2 inches in length and 1/4 inch apart.  Id.  Her right third finger had a 3/16-inch abrasion where the skin comes into the nail.  Id.  She had a 1 3/4 inch by 1/4 inch bruise on the base of her left thumb.  Id. at p. 1081.  Kari's body also displayed two 1/4-inch contusions on her left knee and a 4 inch purple contusion on her right breast.  Id. at p. 1081.

Dr. Snell collected a rape kit from Kari's vaginal area before examing that area.  Id. at pp. 1082-83.  He found three red marks on the inside of her vagina.  Id.

Dr. Snell collected blood from Kari's body and tested it for the presence of substances.  Id. at pp. 1097-98.  Dr. Snell found trazodone in Kari's blood at a level below any level at which a doctor would prescribe that drug (a

"subtherapeutic level").  Id. at p. 1098.  Dr. Snell explained this meant Kari was not regularly taking trazodone.  Id.  Kari had no alcohol or any other substances in her system.  Id.

Dr. Snell opined the cause of Kari's death was asphyxia due to ligature strangulation.  Id. at p. 1099.  He opined the manner of her death was due to homicide.  Id.  Dr. Snell was unable to determine accurately the time of Kari's death because she had spent time in the water in her tub and had been in a cooler overnight before Dr. Snell performed his autopsy.  Id.

Dr. Snell testified that it would take approximately ten to fifteen seconds for a person being strangled by a ligature to lose consciousness.  Id. at p. 1105. It would take approximately three to five minutes of continuous pressure on the ligature to kill the person.  Id.  In order to cause the petechial hemorrhages present in Kari's case, approximately thirty-three pounds of pressure would have had to have been applied to the ligature.  Id. at p. 1106.  Dr. Snell opined the person who strangled Kari would have been behind her because the ligature marks are present on the front of the neck, not the back.  Id. at p. 1107.  Dr. Snell opined that the injuries to Kari's vaginal area were either the result of a sexual assault or rough consensual sex.  Id. at p. 1108. Dr. Snell testified that, in his medical opinion, those vaginal injuries he observed would not be caused by normal consensual sex.  Id.

Amber Bell, a forensic scientist at the South Dakota State Forensic Lab testified she received the rape kit completed on Kari for testing.  Id. at pp. 1195-96, 1198 (JTT Vol. 10).  As part of the rape kit, Ms. Bell received

vaginal swabs, cervical swabs, anal perineum swabs, and oral swabs which she examined for the presence of semen.  Id. at p. 1200.  She found sperm cells on the vaginal swab.  Id. at p. 1201.

Kristina Dreckman, a forensic scientist with the State Forensic Lab, testified that the state lab uses bleach to clean because it does degrade DNA. Id. at pp. 1204, 1211-12.  Burning can also eliminate DNA.  Id. at p. 1212.

Ms. Dreckman tested several items for the presence of DNA and was able to develop a DNA profile from the vaginal swabs and from the Coke Zero can. Id. at p. 1222.  She was not able to develop a DNA profile from any of the other several items she tested.  Id.

The DNA profile from the sperm cell from the vaginal swab was consistent with being a mixture of DNA from both Kari and from Mr. Kryger. Id. at p. 1223.  The Coke can had Kari's DNA and another individual's DNA that Ms. Drecker was unable to acertain who it belonged to.  Id. at p. 1224. The other items tested by Ms. Drecker were swabs from the water knobs in Kari's bathroom, a white tissue, cigarette butts, a Diet Mountain Dew can, a watch, swabs from the DirectTV box in Kari's bedroom, swabs from inside Kari's vehicle, and a zip-up sweatshirt.  Id. at p. 1227.  The DNA from the Mountain Dew can and the white tissue matched that of Kari's son, Nicholas Kirkegaard.  Id. at pp. 1229, 1233.  No DNA profile was obtained from the sweatshirt.  Id.  The cigarette butts matched Kari's DNA.  Id.

Ms. Drecker also tested shampoo and conditioner bottles from Kari's bath, a glass cleaner, and an all-purpose cleaner found at her home as well as

a Dial hand soap dispenser.  Id. at p. 1235.  No DNA profiles were able to be

generated from any of these sources.  Id. at pp. 1236-37.

On cross-examination Ms. Drecker verified that she tested everything

that was forwarded to her to test, but that police had not forwarded every piece

of evidence in the case to Ms. Drecker.  Id. at p. 1244.  Ms. Drecker did not test

the foreign body found in Kari's left ear, a brown piece of foreign material found

on the back of her right knee, or a red piece of foreign material found on her

right groin because these items had not been given to her for testing.  Id. at

pp. 1243-44.  Ms. Drecker was not given any samples from the burn pit to test,

or any samples of bedding or clothing obtained in the investigation.  Id. at

p. 1245.

### vi.    Lead Detective Sgt. Hoffman

Sergeant Martin Hoffman testified he was called to Kari's home on the

evening of March 16 at approximately 7:28 p.m. by Sergeant Bruxvoort.  Id. at

pp. 1246-49 (JTT Vol. 10).  Upon arrival, Sgt. Hoffman noted that the living

room picture window had only very sheer curtains over them, allowing him to

see clearly inside the residence.  Id. at p. 1250.  Upon entering the house,

Sgt. Hoffman smelled from the living room a strong odor of chemicals, or

cleaning-type products, strong odor of bleach which was almost overpowering.

Id. at p. 1251.  When Sgt. Hoffman entered the bathroom at Kari's house, he

noticed there were no bathroom mats or rugs, no towels, and no clothes or

bathrobes.  Id. at p. 1252.  There was no garbage can or hand towels or

anything.  Id.  In Kari's bedroom, Sgt. Hoffman observed no bedding on the bed

and the bedside table appeared skewed about a foot to the side and there were cigarette butts on the floor.  Id. at p. 1253.  Pieces of the blind covering the window in the southwest corner of the bedroom were missing and the window was visible through the hole.  Id.

Sgt. Hoffman recited that the family had identified several missing items from Kari's house including her purse, her keys which were on a red carabiner attached to her purse, bath towels, the mat around the toilet, her bed sheets, and a pink or red bathrobe.  Id. at p. 1255.  Nick and Paetyn gave Sgt. Hoffman a photo that showed Kari's bed with a light and darker blue patterned quilt on the bed as well as some sheets.  Id. at p. 1256.  Although a number of items were collected from around town, none of Kari's missing items were found.  Id. at p. 1257.

Sgt. Hoffman testified he was present when Dr. Snell conducted the autopsy on Kari's body.  Id. at p. 1259.  The investigation turned up names of potential male suspects and Sgt. Hoffman and Det. Montgomery began locating the suspects and interviewing them.  Id. at p. 1261.  Sgt. Hoffman personally interviewed ███████████████████████████.  Id. at pp. 1261-63.  Neither man indicated they had had recent contact with Kari and nothing they said in their interviews raised Sgt. Hoffman's suspicions.  Id. at pp. 1262-64.

Kari's cell phone and computer records confirmed she had not had any recent contact electronically with either man.  Id. at p. 1264.  Neither man rode a bicycle and ████████████ said he could not ride a bike.  Id.  Although ██████████████ girlfriend said he was madly in love with Kari, the girlfriend

48

also stated ███████ had not seen Kari for a few years, he never left his apartment, he did not have a violent bone in his body, and he would not have been capable of Kari's murder and rape.  Id. at p. 1390 (JTT Vol. 11).

Sgt. Hoffman also personally interviewed ███████.  Id. at 1265 (JTT Vol. 10).  There was nothing in his interview that led Sgt. Hoffman to suspect ███.  Id. at pp. 1265-66.  ███ had last seen Kari at a gas station three weeks prior to her death.  Id. at p. 1266.  Sgt. Hoffman also interviewed a ███████ and found nothing of evidentiary value in that interview.  Id. at pp. 1266-67.

Because they had no leads in the case, Sgt. Hoffman and others on the investigation decided to release the video footage from the mosque to the public on March 19.  Id. at p. 1268.  Within a day or so of that video being released, multiple individuals had contacted police and advised that the person in the video was Mr. Kryger.  Id. at p. 1269.  As a result, Sgt. Hoffman decided to interview Mr. Kryger.  Id. at pp. 1269-70.  The interview was video recorded and a copy of the interview was played for the jury.  Id. at p. 1271.

During the interview, Mr. Kryger denied any involvement with Kari's rape or murder, but he did say he was nearly struck by an SUV driving without lights on near the Burger King on 12th Street, thus placing himself within a few blocks of Kari's house on the night of her murder.  Id. at p. 1282 (JTT Vol. 11).  According to Mr. Kryger, this near-accident happened around 11:00 p.m. or 12:00 a.m. on the night of March 14.  Id. at p. 1374.  He asserted he was home by around 1:00 a.m. or 2:00 a.m. on March 15.  Id.  Sgt. Hoffman checked with the National Weather Service and discovered the night of Kari's

murder it had been clear, with a full moon, no precipitation, and temperatures of about 34 degrees Fahrenheit.  Id. at p. 1283.

Mr. Kryger had told Sgt. Hoffman during the interview that he ran into Michael Miller at HyVee on the morning of Friday, March 14.  Id. at p. 1284. Sgt. Hoffman testified that surveillance video from the HyVee store showed that Mr. Kryger met Mr. Miller there on Saturday, not Friday.  Id.

Mr. Kryger told Sgt. Hoffman that he had slid into the river with his bike on the evening of March 14.  Id. at p. 1287.  When police investigated the bike path along the area of 12th Street, they found no marks or disturbances to indicate anyone had fallen into the river.  Id.

At the end of the interview, Sgt. Hoffman viewed Mr. Kryger as a likely suspect.  A DNA sample was obtained from Mr. Kryger pursuant to a search warrant at this time, but he was not arrested.  Id. at p. 1285.  The DNA sample was sent to the state forensics lab and the investigation continued.  Id. at p. 1286.  Of all the tips received from the public as a result of the release of the mosque video, only Mr. Kryger was identified by multiple separate tipsters.  Id. at p. 1288.

Sgt. Hoffman and other investigators had discussions with the state lab about what items law enforcement had collected that would likely yield DNA profiles.  Id. at pp. 1288-89.  Because of the great number of items collected by police in connection with this investigation, and because the state lab had a backlog of testing to be done at that time, only the most promising items were sent to the lab for testing.  Id. at p. 1289.  Sgt. Hoffman received the lab results

on March 28 indicating that sperm was found in the rape kit that matched
Mr. Kryger. Id. at p. 1290. At that point, Sgt. Hoffman concluded Mr. Kryger
was responsible for Kari's rape and murder. Id. at p. 1291.

Sgt. Hoffman swore out an affidavit for Mr. Kryger's arrest and he was
then arrested and subsequently interviewed. Id. Sgt. Hoffman advised
Mr. Kryger what he was being arrested for. Id. The interview was audio
recorded and played for the jury. Id. at pp. 1291-92, 1295. Mr. Kryger
repeatedly denied having sex with anyone other than Ms. Nagel despite
Sgt. Hoffman advising Mr. Kryger of the results of the rape kit and DNA testing.
Id. at p. 1295-96. In a recorded phone call from the jail about six weeks later,
Mr. Kryger told Ms. Nagel that he had had sexual relations with Kari the night
of March 14 after he and Ms. Nagel quarreled. Id.

On cross-examination, Mr. Kadi introduced a video clip from Family
Market, several blocks away from Kari's house on the north side of 12th Street.
Id. at p. 1317. A man on a bicycle is seen in the clip at 3:35:35 a.m. traveling
north. Id. This was the same exact time that an unknown person was
returning Kari's SUV to her driveway after being gone for an hour (which was at
3:38:37 a.m.) several blocks to the south of Family Market. Id. at pp. 1310,
1317. Mr. Kadi also pointed out through cross-examination several other
individuals who appeared on the mosque video and on whom the police had
never followed up. Id. at pp. 1318-32. Mr. Kadi also pointed out evidence that
had been collected such as bedding and items from the burn pit that police had
never subjected to forensic testing. Id. at pp. 1332-41.

Sgt. Hoffman explained that when bedding would be found, police would check with the family to see if anyone could confirm that the bedding belonged to Kari.  Id. at p. 1334.  He testified a lot of the evidence collected by police was eliminated as irrelevant based on information provided by Kari's family.  Id.  In fact all the bedding that police collected was eliminated when photos of it were shown to Kari's family.  Id. at pp. 1374-75.  Also, police had collected some women's clothing in their investigation, but the family indicated it was not Kari's clothing.  Id. at p. 1375.

Mr. Kadi questioned Sgt. Hoffman extensively about his investigation of

███████████████████████████████████████████████████.  Id. at pp. 1341-69.  The state rested its case at the conclusion of Sgt. Hoffman's testimony.  Id. at p. 1397.  Immediately thereafter, the defense rested.  Id.

### b.    Closing Arguments

#### i.    Prosecution

In closing arguments the prosecutor pointed out that it was undisputed that Kari was murdered and that her murder was premeditated.  Id. at p. 1477 (JTT Vol. 12).  The only issue was whether Mr. Kryger committed the crimes. Id.  The state recounted Kari's movements the night of March 14, first to the pizza restaurant and then home around 10:00 p.m.  The state recounted Mr. Kryger's actions—the fight at the billiards parlor with his girlfriend where he became angry enough to smash his cell phone on the ground, and the subsequent trip to his girlfriend's house where he broke up with her.  Id. at p. 1480.  From there, he left on his bicycle.  Id.

The prosecution argued that Mr. Kryger was the person in the mosque video seen riding his bike past Kari's house at 11:30 p.m. headed north, then turning around almost immediately and going back south on the sidewalk and slowing down as he passed Kari's house.  Id. at p. 1481.  The prosecutor posited that Mr. Kryger would have seen Kari through the living room window as she watched television.  Id.

The next time Mr. Kryger appeared was on the mosque video at 2:31 a.m. on March 15.  Id. at p. 1482.  The prosecutor pointed out that four or five different people who knew Mr. Kryger best all identified him as being the person in the video.  Id.  These persons identified Mr. Kryger not only by his clothing, but by his walk; each of them said they could recognize his walk.  Id. Not one of these witnesses except Mr. Kryger's uncle were the least bit uncertain about their identification.  Id. at p. 1484.

The prosecutor argued that Mr. Kryger is the one in the video who took Kari's vehicle, which showed that he had been inside Kari's house as she always brought her purse and keys into the house and put them in the same location.  Id.  The prosecutor suggested Mr. Kryger took the vehicle in order to load up all the bedding, the rugs, the towels, and Kari's clothing.  Id.  The witness from the utility department testified that Kari's bathroom taps were turned on roughly at 1:00 a.m. on March 15.  This evidence showed that Mr. Kryger had already killed and raped Kari and was cleaning up the crime scene by that time.  Id. at p. 1485.

The prosecution continued by arguing that Kari was raped. The evidence of her friends and family and the evidence from her computer and phone showed she was not sexually active nor dating and did not have a boyfriend. Id. She had expressed some interest in finding a companion, but she was not the kind of person who would engage in a one-night stand. Id. Mr. Kryger's phone call to his girlfriend six weeks after Kari's murder and after the DNA evidence was known, stating that he and Kari had had consensual sex, was not true and not supported by any other evidence in the case. Id. at p. 1486.

The prosecutor recounted how Kari's vehicle was backed out of her driveway slowly, the headlights were never turned on, and then the vehicle was immediately pulled into the parking lot of the mosque where the driver stayed inside the vehicle for a while. Id. at p. 1487. The prosecutor argued this was important because Mr. Kryger was not a terribly experienced driver. Id. at pp. 1487-88. He did not have a driver's license. Id. at p. 1488. While parked behind the mosque, Mr. Kryger opened the door to Kari's vehicle, activating the dome light and illuminating the inside of the vehicle; only one person was in the vehicle—Mr. Kryger. Id. at p. 1498. The fact that the vehicle, upon returning an hour later, missed Kari's driveway and had to turn around also showed that the driver was not familiar with Kari's residence. Id.

The prosecutor suggested that Mr. Kryger then bicycled home and changed clothes in an effort to wash away any remaining evidence. Id. at 1488. He then called Ms. Nagel at 4:30 a.m. and arrived at her house at about 4:55 a.m. on March 15. Id. at p. 1489. The next day when Mr. Kryger went to

54

HyVee to get donuts, he had to borrow Ms. Nagel's uncle's jacket because he didn't have one.  Id.  The prosecution pointed out Ms. Nagel's testimony that Mr. Kryger had fresh scratches and injuries to his chest that morning.  Id.  Mr. Kryger himself admitted that he burned his flannel coat because he told Michael Miller that.  Id. at p. 1490.

First thing in the morning on March 15, Ms. Nagel testified she noticed Mr. Kryger had a lot of cash, and this was before he cashed his paycheck at the bank later that day.  Id.  The only rational inference, the prosecutor argued, was that Mr. Nagel obtained the cash from inside Kari's house the night before.  Id.  The prosecutor argued Mr. Kryger's story about falling in the river was not worthy of credence.  Id. at pp. 1491-92.  For one thing, there was no physical evidence anyone had fallen into the river.  Id.  For another, Mr. Kryger claimed to have fallen in the river because he had proposed to Ms. Nagel and she had turned him down, so he was distracted.  Id.  However, the proposal was made on *Saturday* while Mr. Kryger was claiming to have fallen in the river on *Friday*, which was before the proposal had even been made.  Id.

When Paetyn came to Kari's house on March 16, she found the front door dead-bolted and the back door open.  Id. at p. 1492.  This was unusual as Kari never locked the front door and always locked the back door, which had to be locked from the inside.  Id.

The prosecutor explained that the bleach smell would not have been detectible when the water was still turned on and the water in the tub was circulating.  Id. at p. 1493.  However, after the water was drained from the tub,

the bleach would have been on the sides of the tub and, at that point, it would have been a detectible odor.  Id.  The prosecutor reminded the jury that no one did any cleaning after Kari's body was discovered.  Id.

The prosecutor argued it was clear that Mr. Kryger had used a cleaner to clean up Kari's house and had taken measures such as wearing gloves in order to prevent any detection.  Id.  He contrasted Mr. Kryger's first police interview with the second interview in which Mr. Kryger challenged the police asking "where are all the fingerprints?"  This showed that Mr. Kryger was confident that he had cleaned up the murder scene well.  Id. at p. 1494.  The prosecutor asked the jury to remember the coroner and family members commenting on how short Kari's nails were in death.  Id.

The prosecutor went through all the other potential suspects and noted that none of them had had any recent contact with Kari.  Id. at pp. 1495-96.  The prosecutor noted that Mr. Kryger's semen was found inside Kari's body and that there were no DNA profiles found at the crime scene that were unidentified.  Id. at p. 1496.

The prosecutor pointed out that Mr. Kryger told police in his first interview that he did not know Kari, and that he had not had sex with anyone other than Ms. Nagel.  Id. at p. 1499.  Only after Mr. Kryger learned that his DNA was found inside Kari's body did he make up this story that he and Kari had had a consensual sexual relationship.  Id. at p. 1500.

ii.     **Defense**

Mr. Kadi delivered a closing argument on Mr. Kryger's behalf.  He began by arguing that Mr. Kryger and Ms. Nagel were in love.  Id. at p. 1502.  He stated that Mr. Kryger had proposed to Ms. Nagel on Valentine's Day in February 2015, but she had turned him down.  Id.  He recited the facts concerning the quarrel at the billiards parlor between the two and then the subsequent encounter at Ms. Nagel's house.  Id. at pp. 1502-03.  Feeling sad and rejected, Mr. Kadi argued that Mr. Kryger met Kari and the two slept together.  Id. at p. 1503.  But Mr. Kryger realized that he was really in love with Ms. Nagel and so he went back to her the next morning.  Id. at p. 1503-04.  Mr. Kryger just didn't have the will to tell her at that point about having slept with Kari, so he did not tell her.  Id. at p. 1504.

In Mr. Kryger's first interview with Det. Hoffman, although he was asked if he knew "Kari Kirkegaard," the detective never showed Mr. Kryger a photo of Kari.  Id. at p. 1504.  Counsel[7] suggested that perhaps Mr. Kryger never knew Kari's name.  Id.  Asking the jury to recall whether anyone had ever given them the wrong phone number at a bar, or the wrong name, he stated, "sometimes the needs of the moment are met and nothing needs to be discussed afterwards or ever thereafter."  Id.

Counsel suggested it might not be out of character for Kari to have a one-night-stand with a stranger, recalling "stories of things happening at the

[7] Use of "counsel" throughout this section refers exclusively to Mark Kadi as only Mr. Kadi made closing arguments on behalf of Mr. Kryger.

Gaslight" where ██████████ lived and where "time flows a little different . . . and for some, time moves slowly." Id. Counsel then drew the jury's attention to clues regarding other suspects that police did not follow up on, specifically ██████████. Id. He stated that, for women like Kari, time can move slowly "when waiting for some other time for some other person to come by, to give a smile or just take a smile. . ." Id. at p. 1507. "But when an opportunity does come by, when a smile does come a person's way, and the possibility of hopes that this person who is talking to the Lori Nagels and Kari Kirkegaards of [the world] that this person may finally be different from the other ones that this person may have met in the past, that possibility of hope outweighs the certainty of loneliness that someone would have if they just went straight home from the" pizza restaurant. Id. at p. 1508.

Counsel admitted that Mr. Kryger had sex with Kari, but argued that he lied about it to preserve his relationship with Ms. Nagel. Id. Counsel argued Mr. Kryger did not kill anyone, but he did try to tell police about the SUV without any headlights on that may have been responsible. Id. Counsel argued the police did not pay attention to Mr. Kryger, they were not listening. Id.

Counsel pointed out that Mr. Kryger cooperated with the police. Id. at p. 1509. When police wanted to interview him, he readily agreed. Id. He agreed to give a DNA swab and fingerprints. Id. He gave police names and contact information for witnesses who could verify Mr. Kryger's movements. Id.

Counsel argued Mr. Kryger made mistakes about dates, but not about the sequence of events. <u>Id.</u> at pp. 1510-11. Given Mr. Kryger's work schedule, this was understandable. <u>Id.</u> at p. 1511. Counsel pointed out that Det. Hoffman got a date wrong when testifying under oath before the grand jury in this case. <u>Id.</u>

Counsel argued that it was Mr. Kryger riding his bike in the Family Market video at 3:30 a.m. on March 15, so he could not simultaneously have been parking Kari's vehicle in her driveway three blocks away as shown on the mosque video at 3:30 a.m. <u>Id.</u> at pp. 1513-16. Counsel pointed out that the prosecution had not played the video from the Family Market for the jury "because they don't want you seeing evidence that Chris Kryger was at a place other than where that SUV was." <u>Id.</u> at p. 1516. Counsel pointed out that the lead detective in this case did not watch the Family Market video. <u>Id.</u> at p. 1517. Counsel argued that the police had already formed their theory of who killed Kari and so they were only looking for evidence that confirmed their theory and not seeing other relevant information. <u>Id.</u> at p. 1517-18.

Counsel then talked to the jury about other individuals in the mosque video that police never followed up on. <u>Id.</u> at p. 1518. Counsel pointed out the police collected bedding from various places around town, but never sent any of it to the crime lab to be tested. <u>Id.</u> at p. 1519-20. Counsel also pointed out that, because police let Kari's family enter the house early on, the crime scene was contaminated. <u>Id.</u> at p. 1520. Counsel also pointed out that none of the early responders to Kari's house reported smelling bleach or cleaning

59

chemicals.  <u>Id.</u> at p. 1521.  He argued that many of the witnesses gave contemporaneous statements to police that differed from their trial testimony. <u>Id.</u> at p. 1522.  For example, Ross Plucker testified that he smelled an overpowering smell of bleach, but in his statement to Det. Slattery in March 2015, he said he couldn't smell anything specific, although there was a foul smell.  <u>Id.</u>  Counsel pointed out that, at trial, everyone is saying the same thing.  <u>Id.</u>

Counsel argued that, while Kari's family and friends testified at trial that she had no sexual activity for decades, the police investigation revealed that she did have a sexual history with ███████████████████████████ and that she had explored dating sites.  <u>Id.</u> at p. 1524.  Counsel pointed out that a search of Kari's bedroom revealed a condom in a box on her dresser, so she was clearly thinking about sex.  <u>Id.</u> at p. 1525.  He suggested she was lonely and she was trying to change that.  <u>Id.</u>  And he suggested if Kari did entertain one-night-stands, it was understandable she would not tell her friends and family about that.  <u>Id.</u> at p. 1526.

Counsel talked about the fact police had searched Mr. Kryger's house, his workplace, and Ms. Nagel's house and never found Kari's missing purse, car keys, or bedding.  <u>Id.</u> at p. 1528.  Counsel suggested his client was not a mastermind—he got around town on a bike, he worked for $100 a week doing manual labor, he proposed to Ms. Nagel one week after meeting her, and he got pushed around in a bar.  <u>Id.</u> at pp. 1528-29.

Regarding the prosecution's excuses for not testing more evidence at the state crime lab, counsel pointed out that this was a murder case, among the most important kinds of cases prosecuted and it certainly called for greater scientific investigation than a drug case.  Id. at p. 1529.  Rather than test items that needed to be tested, counsel suggested the prosecution team elected to test only those items that furthered their theory of the case.  Id. at p. 1531.

Counsel talked about how Officer Toft did not test a glass on the bedside table in Kari's room until November 6, after the trial had already begun.  Id. at pp. 1531-33.  That fingerprint test excluded Mr. Kryger from being the person who touched the glass.  Id.  Counsel argued it was "concerning" that evidence was still being tested in the midst of trial and questioned how much other evidence might come in *after* the trial, exonerating Mr. Kryger.  Id.  Counsel mentioned the foreign material found on Kari's knee, groin, and left ear that were never tested.  Id. at p. 1533-35.

Counsel also pointed out that the carpet outside the bathroom had whited-out blood stains, bleached blood stains, but the carpet was never sent for testing.  Id. at p. 1535.  Counsel argued the state was just asking the jury to guess that the blood on the carpet would have been shown to belong to Brian Johnson.  Id. at pp. 1535-36.  Counsel also argued the police never tested the DNA samples they obtained from ███████████.  Id. at p. 1536.

Finally, counsel urged the jury to look at the coat on the back of the man in the mosque video and compare it to the coat Mr. Kryger was wearing in the photo taken from Ms. Nagel's phone.  Id. at p. 1537.  He argued the two coats

61

were not the same coat, that one had white lines that were thicker and wider than the white lines in the other coat.  Id.

### iii.    Rebuttal

The prosecutor began by talking about the Family Market video.  Id. at pp. 1538-39.  He reminded the jurors of testimony elicited during the playing of the Family Market video that the bike viewed in that video clip did not have any reflectors on it.  Id.  The bike in the mosque video *did* have reflectors on it.  Id. When police seized Mr. Kryger's blue bicycle, it *had* reflectors on it.  Id. Therefore, the person in the Family Market video could not be Mr. Kryger because that individual was riding a bike without any reflectors.  Id.

The prosecutor reminded the jury that police had examined Kari's phone and computer and she had had no contact with any of the other suspects going back to January 2015.  Id. at p. 1541.  The state pointed out that much of defense counsel's argument was not evidence in the record.  Id. at p. 1542. Mr. Kryger had said the sex with Kari happened at his house, but the evidence showed Kari arrived at her home at 10:00 p.m. and never left.  Id. at p. 1543.

The prosecutor summarized the evidence against Mr. Kryger:  four people identified his clothing in the mosque video, four people independently identified his walk in that video, he rode his bicycle with reflectors on it everywhere, a bicycle with reflectors is seen in the mosque video.  Id. at p. 1544.  Plus, the prosecutor argued Mr. Kryger had a motive:  he was angry.  Id.  He had gotten so angry he smashed his cell phone and then broke up with Ms. Nagel.  Id. And he never related any of these events to the police.  Id.  And the next

62

morning before he cashed his paycheck he suddenly had much more money than he usually has.  Id. at p. 1545.  In his statements to police, Mr. Kryger admitted being in the vicinity of Kari's house the night she was murdered.  Id.

The prosecutor pointed out that Mr. Kryger himself told police he had a criminal mind in his interviews with them.  Id. at p. 1546.  He talked a lot about DNA and fingerprints, suggesting that he could plan a crime, plan how to get away, and how to dispose of evidence.  Id.

As for Kari's sexual history, the prosecutor pointed out that all the evidence in the case indicated Kari had had two sexual partners her whole live—███████████████—and the sex with either of them was years in the past.  Id. at p. 1547.  She had tried to go on a dating site, but had no contact or communication with any man.  Id. at p. 1547-48.  The condom on Kari's nightstand put the lie to defense counsel's argument:  if Kari was going to have consensual sex with Mr. Kryger, she would have used the condom.  Id. at p. 1549.

The prosecutor also pointed out numerous inconsistencies in Mr. Kryger's statement to police.  Id.  He said he slid into the river Friday night because he was preoccupied thinking about Ms. Nagel's rejection of his marriage proposal, but the marriage proposal happened the next day, Saturday, not Friday.  Id.  Mr. Kryger never explained his sudden influx of cash on Saturday morning before he even cashed his paycheck.  Id.  The prosecution completed its closing argument by stating that the evidence yielded only one

rational, reasonable explanation of all the evidence: Mr. Kryger used his criminal mind to murder and rape Kari Kirkegaard. Id. at p. 1550.

### c.    Inadvertant Jury View of Mr. Kryger

The jury deliberated from 4:40 p.m. until 10:00 p.m., when the court sent them home with an admonishment to avoid all media and not to talk to anyone about the trial. Id. at pp. 1553-54. They returned at 9:00 a.m. the next day to resume deliberations. Id. at p. 1560 (JTT Vol. 13).

After the jury left the courtroom, Mr. Kadi raised the following matter. Id. at p. 1562. He stated the night before after the jury had been dismissed for the evening, the jury got on the elevator on the fifth floor of the courthouse. Id. The jailers took Mr. Kryger down a set of stairs to the fourth floor of the courthouse and entered the hallway there. Id. A cleaning lady happened to be on the fourth floor and she had pushed the button for the elevator. Id. While Mr. Kryger was in the hallway, the elevator doors opened. Id.

The bailiff did his best to block the jury's view into the fourth floor hallway, but Ms. Monson of the jury and perhaps two other jurors saw Mr. Kryger. Id. at p. 1563. Ms. Monson made a comment, "Oh, can you hear him coming?" Id. The jailers tried to get out of the area as quickly as possible. Id. Mr. Kadi reminded the court of Det. Forster mentioning that Mr. Kryger had a parole officer. Id. He asserted that the recorded phone call between Mr. Kryger and Lori Nagel had an automated voice talking about his being an inmate. Id. Mr. Kadi argued this was the straw that broke the camel's back and asked the court to declare a mistrial. Id.

The court arranged for the bailiff, Scott Pfeifer, to testify to the event so that there was a record. Id. at pp. 1564-65. Mr. Pfeifer testified he was with the jury the evening before during jury deliberations. Id. at p. 1565. After the court dismissed the jury for the evening, Mr. Pfeifer got them on the elevator at approximately 10:13 p.m. to take them down to the basement to put them on the transport vehicle. Id. at p. 1566. The elevator stopped on the fourth floor and the door opened. Id. There was a cleaning person right outside the door. Id. Officers Brewer and Doppenburg were there, transporting Mr. Kryger back to the jail. Id.

Mr. Pfeifer stepped forward, facing Mr. Kryger and the officers, to try to shield the jury from seeing Mr. Kryger as much as he could. Id. at pp. 1566, 1569. Juror Feldman was directly behind Mr. Pfeifer and he stated, "oh, you must have heard them coming." Id. at p. 1566-67. Mr. Pfeifer made no response to the comment. Id. at p. 1567. The elevator door closed, the jurors continued down to the basement, and they got on the van to be transported. Id. Mr. Pfeifer testified that Mr. Kryger did not have any leg restraints on at the time. Id. Mr. Kryger was wearing a long-sleeved shirt, or perhaps a short-sleeved shirt, but in any case, Mr. Pfeifer could not see any handcuffs. Id. at p. 1567, 1571. Mr. Kryger was wearing civilian clothes as were Deputy Brewer and Deputy Doppenburg. Id. at p. 1568.

Neither of Mr. Kryger's custodians showed any evidence in their person or their appearance of either carrying restraints or weapons to be used on Mr. Kryger. Id. They did not display any badge on their person that Mr. Pfeifer

saw.  Id.  Deputy Brewer had a set of keys in his hand and was flipping the keys back and forth, making a metallic clanking sound.  Id. at p. 1568-69.

The court found that the jury inadvertently saw Mr. Kryger in civilian clothes and without any discernible restraint.  Id. at p. 1574.  The two gentlemen who accompanied him were also in civilian clothing and did not have badges or the appearance of law enforcement officers.  Id.  They did not have a weapon and were not carrying any restraints.  Id.  The court reasoned that the jury could very well believe the two men were with Mr. Kryger for his protection rather than to keep him in custody.  Id. at p. 1575.  The court noted that it had taken steps to protect Mr. Kryger by excluding two of Kari's family members from the courtroom, so the idea the jury might have thought Mr. Kryger had a protection detail was not in any way fanciful.  Id. at p. 1576. The court concluded that the incident did not suggest to the jury that Mr. Kryger was in custody when they saw him.  Id.

In addition, the court noted that just minutes before the incident, the court had given the jury the most stern admonishment he had given so far in the trial.  Id. at p. 1577.  He did this intentionally, wanting them to understand the solemnity of their deliberations and how they cannot be influenced by anything outside the courtroom.  Id.  The court concluded it was reasonable that the jury still had this admonishment in mind when they encountered Mr. Kryger only minutes later.  Id.  The bailiff's efforts to prevent contact between the jury and Mr. Kryger would have been the same whether the person in the hallway was the defendant, a lawyer, or any witness.  Id. at p. 1578.

66

Based on all of the circumstances presented, the court denied the motion for a mistrial. Id.

The jury returned its verdict of guilt on all charges except third-degree rape at 3:44 p.m. Id. at pp. 1580-83. The court inquired of the jury whether all jurors agreed with the verdict and all indicated they did. Id. at p. 1583. The court inquired whether Mr. Kadi wished to have the jury polled and he indicated he did not. Id.

### 5.    Sentencing

The trial court sentenced Mr. Kryger on April 27, 2016. Id. at p. 680-81. At the hearing, the prosecution asked for mandatory life imprisonment on the murder charge and maximum sentences on the rape and burglary charges. Id. at 795. The state related Mr. Kryger's criminal history: a juvenile adjudication for assault on a law enforcement officer, a first-degree escape conviction, a conviction for burning within the jail, and an aggravated assault conviction. Id. at pp. 795-96. He was paroled in August 2008 and attacked T.N. four months later. Id. at p. 796.

While on parole, the prosecutor indicated Mr. Kryger was arrested in December 2009 for violating a protective order. Id. The protective order application indicated Mr. Kryger had threatened to hurt the victim's son and had strangled her animals. Id. Three days after being released from jail for the first protective order violation, Mr. Kryger was arrested for another protective order violation involving the same victim. Id. at p. 797. As a result of these violations, his parole was revoked and he was sent back to prison again, being

67

released in December 2013, four months before committing the murder and rape in this case.  Id.

The state court sentenced Mr. Kryger to life imprisonment for first-degree murder; fifty years' imprisonment for second-degree rape, to run concurrently to the murder sentence; and twenty-five years' imprisonment for first-degree burglary, to run concurrently to the murder sentence but consecutively to the rape sentence.  Id.

**B.    Direct Appeal**

Mr. Kryger timely filed a notice of appeal.  CR at p. 683.  He raised the following issues in his direct appeal, being represented again by Mr. Kadi and Mr. Vos:

> 1.    whether the trial court violated Mr. Kryger's Due Process and Confrontation Clause rights by limiting his cross-examination of Kari's brother Brian Johnson.
>
> 2.    whether the trial court erred in admitting Dr. Snell's expert opinion.
>
> 3.    whether the trial court erred in admitting irrelevant evidence without foundation of physical evidence from the state's investigation.
>
> 4.    whether the trial court erred in admitting evidence that Mr. Kryger told detectives he had a criminal mind.
>
> 5.    whether the trial court erred in refusing the grant a mistrial when the jury, on multiple occasions, was exposed to matters indicating Mr. Kryger had a prior record.
>
> 6.    whether the trial court erred by rejecting Mr. Kryger's proposed jury instructions as to how the jury could use the evidence that Mr. Kryger stated he had a "criminal mind."
>
> 7.    whether the trial court erred by rejecting Mr. Kryger's proposed jury instructions concerning speculation and conjecture.

8.     whether the trial court erred by denying Mr. Kryger's motion for a judgment of acquittal on each count of conviction.

9.     whether the trial court erred by rejecting Mr. Kryger's proffered alibi jury instruction.

10.    whether the accumulation of all assigned errors constituted grounds for reversal.

State v. Kryger, #27869 at pp. 1-10 ("SDSCT").[8]  The South Dakota Supreme Court affirmed Mr. Kryger's conviction.  State v. Kryger, 907 N.W.2d 800, 805 (S.D. 2018).

**1.     Limitations on Cross-Examination of Brian Johnson**

As to the first issue, the court noted Brian Johnson had threatened Mr. Kadi after a pretrial hearing, made comments to the media that he would torture and kill Mr. Kryger if he was released or not convicted, and made comments on Facebook that he would harm or kill Mr. Kryger and his lawyer. Id. at p. 807.  The trial court had excluded Mr. Johnson from trial because of these threats, but it allowed the state to call Mr. Johnson as a witness and limited Mr. Kadi's cross-examination of him to preclude reference to the threats Mr. Johnson had made.  Id.

The court reviewed this error under the abuse of discretion standard and required a showing of both error and prejudice.  Id.  Prejudice required Mr. Kryger to show that "a reasonable jury probably would have a significantly

---

[8] The South Dakota Supreme Court's file, unlike the trial court's file, is not sequentially numbered throughout.  The page citations used by this court are the page numbers of the PDF transmitted to this court from the Supreme Court containing the docket and relevant pleadings filed before that court.

different impression if otherwise appropriate cross-examination had been permitted." Id. Although a criminal defendant's Confrontation Clause rights are fundamental, the court noted that "[a]n individual is only guaranteed 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Id. at 808 (quoting State v. Spaniol, 895 N.W.2d 329, 340 (S.D. 2017), quoting Milstead v. Smith, 883 N.W.2d 711, 717 (S.D. 2016)). Here, the threats to Mr. Kryger and his counsel were not contemporaneous to the events Mr. Johnson testified to at trial, and defense counsel was still allowed to cross-examine Mr. Johnson about his bias arising from his relationship with Kari. Id. Also, the jury heard the evidence of Mr. Johnson's emotional reaction of punching the wall in Kari's bathroom. Id.

The court concluded that the trial court had not erred in limiting cross-examination of Brian Johnson. Id. Furthermore, the court held Mr. Kryger had not shown prejudice. Id. Mr. Johnson's testimony was limited to the events immediately after Kari's body was found and the circumstances that led police to begin a homicide investigation. Id. Other witnesses testified to many of the same facts as Mr. Johnson detailing the missing purse and keys, the missing bedding, and the bleach smell. Id. at 808-09. All of the case law discussed by the court in connection with this issue were decisions by the South Dakota Supreme Court. No federal constitutional decisions were discussed or cited. Id.

70

### 2.    Admission of Dr. Snell's Expert Opinion

The court rejected Mr. Kryger's assertion that Dr. Snell's testimony was insufficiently certain to have been admitted as expert opinion at trial.  Id. at 809-10.  The court held Dr. Snell's opinion was clear, it was based upon a reasonable degree of medical certainty, it was supported by an adequate foundation in the record, and it assisted the jury.  Id.

### 3.    Admission of Irrelevant Evidence

Mr. Kryger argued the state should not have been allowed to introduce any evidence of the burn pit because none of the items from the burn were tested forensically and none were shown to have any connection to Mr. Kryger. Id. at 810.  The court found the burn pit evidence to be relevant because it made it more probable that Mr. Kryger had destroyed evidence.  Id.  Michael Miller testified that Mr. Kryger had told him he burned his flannel coat and there had been fabric found in the remnants of the fire.  Id.  Furthermore, the burn pit was fresh, had appeared within the time frame of Kari's death, and was near the places Mr. Kryger was known to have visited at the time of the murder.  Id.  The fact that none of the burn pit items were forensically tested went to the weight of the evidence, not its admissibility the court held.  Id.

### 4.    Admission of Mr. Kryger's Criminal Mind Statement

In both of his interviews with detectives, Mr. Kryger had made references to having a "criminal mind."  Id.  In his first interview, he expressed fear for the safety of Ms. Nagel, who lived in the vicinity of the murder.  Id.  Det. Forster told Mr. Kryger police were telling people to lock their doors and use the buddy

71

system.  Id.  Mr. Kryger responded he did not think that would work because "if I actually have a criminal mind . . . if I want to get into a place, I'll just kick the door in . . . and . . . that's not stopping [inaudible] nobody."  Id. at 810-11. During Mr. Kryger's second interview, he also told Det. Hoffman he had a "criminal mind."  Id. at 811.

The court noted counsel had moved to exclude these statements before trial as impermissible character evidence.  Id.  The court observed that the statements were ambiguous.  Id.  On the one hand, they could be interpreted as statements that Mr. Kryger "knew something about the crime or how to commit the crime."  Id.  On the other hand, the jury may have understood these to be statements by Mr. Kryger "about his character; that he was the *kind* of person who would have committed this crime."  Id.  Again, the court stated Mr. Kryger had to prove an error occurred (an abuse of discretion) and that he was prejudiced thereby.  Id.

The court held Mr. Kryger failed to show prejudice.  Id.  The court noted that the statements were isolated and made without any context as to whether Mr. Kryger had ever committed any similar acts or been convicted of similar conduct.  Id.  The statements were referenced by the state, but were not the central focus of the closing arguments.  Id.  But most importantly, the court held, there was substantial independent evidence of Mr. Kryger's guilt.  Id. at 812.

### 5.    Denial of Defense Motions for Mistrial

The court reviewed the denial of Mr. Kryger's motions for mistrial on an abuse of discretion basis and noted that the trial court had reserved ruling on the motions until all the evidence had been received so as to assess the impact of any error that had occurred.  Id.  The court held the trial court's decision to deny the mistrial motions was well-reasoned and that the court took adequate measures to minimize the impact of the errors, giving limiting instructions to the jury in the case of the reference to Mr. Kryger's parole officer, and to his being incarcerated on the recorded phone call.  Id. at 813.  The court found no abuse of discretion on the part of the trial court.  Id.

### 6.    Jury Instructions

In its opinion the court combined each of Mr. Kryger's assignments of errors concerning jury instructions.  Id.  These errors were also reviewed under the abuse-of-discretion standard.  Id. at 814.  The court considered the jury instructions as a whole and evaluated whether they "correctly state[d] the law and inform[ed] the jury."  Id.  The court concluded the jury was properly instructed with accurate statements of the law and that the trial court had "provided adequate reasoning for rejecting" the defendant's proposed instructions.  Id.

### 7.    Sufficency of the Evidence

The basis for Mr. Kryger's motion at the trial level was that the evidence was insufficient to sustain a conviction for any count of the indictment.  Id. at 815.  The court reviewed this issue *de novo* and considered the evidence in the

light most favorable to the verdict.  Id.  The court then reviewed the evidence.  Id.

The court noted "both direct and circumstantial evidence existed linking Kryger to Kirkegaard's death."  Id.  His sperm DNA was found inside Kari even though he denied knowing her or having sex with her.  Id.  The evidence suggested Kari was not sexually active at the time.  Id.  Kari arrived home immediately after the pizza dinner, making it unlikely she had met up with Mr. Kryger and brought him into her home from another location.  Id. Mr. Kryger admitted riding his bike during the time of Kari's murder and the mosque video depicted him (as identified by three witnesses), riding his bike past Kari's home at the time of her death.  Id.

The autopsy revealed signs of force (ligature marks on Kari's neck and a fractured hyoid bone) as well as red marks in her vagina.  Id.  Kari's purse was missing and, within a few hours, Mr. Kryger suddenly had an uncharacteristic amount of money in his possession.  Id.  Although Mr. Kryger later claimed in a phone call to Ms. Nagel that he and Kari had had consensual sex on the night of the murder, there was no evidence in the case to show "how or why that consensual sex would have occurred."  Id.  The court concluded the evidence and all favorable inferences from that evidence supported the jury's verdict and the trial court had not erred in denying Mr. Kryger's motion for a judgment of acquittal.  Id.

Because the court had found no error by the trial court, the supreme court also rejected Mr. Kryger's argument that cumulative errors justified reversal.  Id.

## C.    State Habeas Proceedings

Mr. Kryger filed a petition for a writ of habeas corpus in state court on December 19, 2018.[9]  Kryger v. Young, Civ. 19-147 at pp. 1-2 ("HC").  One of the claims raised by Mr. Kryger in his petition was that the South Dakota Supreme Court had applied the wrong legal standard in evaluating his Confrontation Clause claim.  Id. at p. 47.  The state habeas court dismissed this claim as having been previously litigated.  Id.

The remaining claims in Mr. Kryger's state habeas petition were:

1.    Mr. Kryger's attorney did not do his job to the best of his abilities, he wasn't challenging things being said or being introduced into evidence.

2.    The burglary conviction was unsupported because there was no evidence of anything ever being stolen.

3.    Mr. Kryger didn't get to cross-examine Brian Johnson about the mysterious smell of bleach.  Clearly the crime scene clean up activities must have occurred when the family members and friends were in the house, not before.

---

[9] The court gives Mr. Kryger the benefit of the prison mailbox rule as to the date of his petition.  The petition is dated December 19, 2018, but it was not filed by the clerk of court until a year later on December 21, 2019.  See HC at p. 2.  The habeas court's order granting Mr. Kryger's motion for waiver of fees is dated January 8, 2019, and filed January 14, 2019.  Id. at p. 17.  Therefore, it appears Mr. Kryger's petition was received by the clerk in December *2018*.  The December *2019* file stamp is either in error, or the state court held the petition and did not file it for a year.  This court notes the case number assigned to the petition indicates the case was opened in 2019 (i.e., Civ. 19-147).

> 4.    No one could identify Mr. Kryger as the man in the mosque video because that video was too grainy for precise identification. The witnesses who purportedly identified Mr. Kryger from that video were speculating.
>
> 5.    Mr. Kryger was the bicyclist in the Family Market video, proving that he could not have been the person parking Kari's vehicle at her house at the exact same time.
>
> 6.    Richard Foster testified that the man in the mosque video was not Mr. Kryger.
>
> 7.    The state introduced many items of evidence that were never shown to have any connection to Mr. Kryger such as the Coke Zero soda can and the black zip-up hooded sweatshirt.
>
> 8.    Numerous items of evidence were tested and showed no connection to Mr. Kryger such as the household cleaner bottles, the shampoo and conditioner bottles, and the Dial hand soap dispenser.
>
> 9.    The state failed to forensically test the carpet outside Kari's bathroom or the casting of the footprint from outside her bedroom window.

Id. at pp. 1-7.

The respondent moved for the entry of summary judgment in his favor on all of Mr. Kryger's claims.  Id. at p. 68.  In responding to the motion, Mr. Kryger filed an affidavit from Mr. Kadi stating that from October 14-16, 2015, he was counsel in another case in which his client was charged with twenty counts of aggravated assault.  Id. at p. 111.  Mr. Kryger's trial commenced just eighteen days after the aggravated assault trial had concluded.  Id.  Because of this, and because of the extensive trial preparation required in both cases, the time Mr. Kadi used to prepare for the assault trial was time that he was not able to use to prepare for Mr. Kryger's trial.  Id. at p. 112.

Respondent filed Mr. Kadi and Mr. Vos's time records for the time they spent working on Mr. Kryger's criminal case and direct appeal.  Id. at pp. 146-61.  Those records show a total of 361.5 hours were spent in pursuance of Mr. Kryger's direct appeal.  Id. at p. 150.  A total of 816.93 hours were spent by Mr. Kryger's lawyers in his criminal case at the trial court level.  Id. at p. 161.

The state habeas court granted summary judgment in favor of respondent on Mr. Kryger's petition without holding an evidentiary hearing.  Id. at pp. 165-77.  On Mr. Kryger's claim of ineffective assistance of counsel, the court set forth the standard for evaluating such claims under Strickland v. Washington, 466 U.S. 668, 687 (1984).  Id. at p. 169.  The court noted that Mr. Kadi's affidavit did *not* state that he was unable to adequately prepare for Mr. Kryger's trial nor that he was unprepared.  Id. at pp. 170-71.  Instead, the sole sum and substance of the affidavit was that time spend preparing for and trying the assault case was time that Mr. Kadi did not spend on Mr. Kryger's case.  Id.  The court then reviewed the numerous pretrial motions filed by Mr. Kadi on Mr. Kryger's behalf, many of which were successful.  Id. at p. 171.  Furthermore, the court examined Mr. Kadi's time records and found that he spent a significant amount of time on Mr. Kryger's case.  Id.  The court concluded Mr. Kryger had failed to create a genuine issue of material fact about his counsel's preparedness.  Id.

As to Mr. Kadi's trial tactics, Mr. Kryger failed to respond to respondent's statement of material facts in respondent's summary judgment motion.  Id.

77

Accordingly, the state habeas court found this issue also appropriate for summary judgment in respondent's favor.  Id.

Mr. Kryger had alleged counsel was ineffective for failing to effectively cross-examine Brian Johnson about money missing from Kari's home.  Id. at p. 172.  The state habeas court reviewed the trial transcript and found that counsel *had* in fact cross-examined Mr. Johnson about this issue.  Id. (citing JTT Vol. 6 at p. 119).

Mr. Kryger had alleged counsel was ineffective for failing to effectively cross-examine Brian Johnson about the smell of bleach in Kari's home, asserting that Kari's family tampered with the crime scene and caused evidence to be lost.  Id.  The state habeas court reviewed the trial transcript and found that counsel had cross-examined not only Mr. Johnson but all of Kari's family and friends that testified about the issue of the bleach odor and whether anyone in the house had used any cleaning products in between the first and second visit to the house by police.  Id. at p. 173.

Regarding Mr. Kryger's assertion that he was the bicyclist in the Family Market video, the state habeas court noted that defense counsel brought this out in cross-examination of the state's witnesses and played the video for the jury.  Id.  Furthermore, Mr. Kadi argued forcefully in closing arguments that Mr. Kryger was the man seen in the Family Market video, so he could not have been the murderer who was, at that very same moment, parking Kari's vehicle in Kari's driveway.  Id.  The court also noted Mr. Kadi sought, unsuccessfully, for an alibi instruction to be given to the jury.  Id.  In the end, counsel did

78

everything he could to further this defense theory and it was up to the jury to
watch both videos and determine whether Mr. Kryger was depicted in
either.  Id.

Regarding Mr. Kryger's assertion that counsel inadequately pointed out
the poor quality of the mosque video, the state habeas court noted Mr. Kadi
had questioned numerous state witnesses about the quality of the video and
the fact that it was difficult to see details of the person's clothing or face.  Id. at
p. 174.  Mr. Kadi also attacked the credibility of the witnesses' identification of
Mr. Kryger from the video.  Id.

Regarding Mr. Kryger's assertion that counsel should have objected to
the introduction into evidence of the Coke Zero can, the cleaning bottles, the
black hooded sweatshirt, and other items, the court found that the admission
of these items actually furthered counsel's trial strategy:  counsel argued that
the state only selectively investigated and did not test items that might not
have supported their theory of the crime.  Id. at pp. 174-75.  Because he did
not object and the items were admitted, counsel was able to argue that these
items could not be connected to Mr. Kryger.  Id. at p. 175.

As to all the above, the state habeas court found that Mr. Kryger had not
demonstrated that Mr. Kadi's performance was below a professional standard.
Id. at p. 175.  Furthermore, the court found Mr. Kryger could not establish
prejudice as to any of these issues.  Id.  The court set forth the South Dakota
Supreme Court's summary of the evidence on direct appeal.  Id. at p. 176.
Based on the sufficiency of the evidence in support of the verdict, the state

79

habeas court concluded even if error had occurred, it had not prejudiced Mr. Kryger because the result of the case would not have been different.  Id.

After the state habeas court issued its decision, Mr. Kryger timely moved for a certificate of probable cause on all issues of ineffective assistance of counsel.  Id. at pp. 179-80.  The state habeas court denied that motion.  Id. at p. 194.

Mr. Kryger then timely sought a certificate of probable cause from the South Dakota Supreme Court.  Kryger v. Young, #29829 at pp. 2-9.  The state supreme court denied that request on March 17, 2022.  Id. at p. 143.

## D.    Mr. Kryger's § 2254 Claims in This Court

Mr. Kryger timely filed his federal habeas petition before this court on June 29, 2022.[10]  He raises four claims for relief in that petition:

> 1.    Ineffective assistance of counsel—counsel was unprepared for trial, failed to object to certain evidence being introduced, and failed to ask questions that were relevant.
>
> 2.    Due Process—the state was allowed to question its witness, Brian Johnson, while Mr. Kryger's cross-examination of Mr. Johnson was circumscribed by the trial court.
>
> 3.    Reasonable Doubt—Mr. Kryger alleged the evidence was insufficient to show guilt beyond a reasonable doubt and emphasizes three things:  (1) police asserted he bleached the

---

[10] The federal statute of limitations for filing a § 2254 habeas petition is one year.  28 U.S.C. § 2244(d)(1).  That limitations period began to run 90 days after the direct appeal was decided (May 19, 2018).  The limitations period was tolled during the time Mr. Kryger's state habeas petition was pending (from December 19, 2018, until March 17, 2022).  It resumed running the day thereafter.  Therefore, approximately five months of the one-year period ran from May 19 to December 19, 2018, and approximately three and one-half months ran after the conclusion of Mr. Kryger's state habeas proceedings.  In total, he used less than nine months of the allotted one-year period before filing with this court.

victim's house, but the bleach smell did not present itself in the victim's house until after the body was removed; (2) the grainy poor quality video [from the mosque] was inadequate to show it was Mr. Kryger and another video from a location two miles away showed Mr. Kryger was in another location; and (3) the prosecution introduced evidence that had no bearing on the case such as empty bottles of cleaning supplies, a Coke Zero® can, two guaze squares, a black fleece hooded sweatshirt, and poor quality still photographs, all of which items Mr. Kryger alleges were not tied to him in any way.

4.    Prejudicial Jury—while Mr. Kryger asserts he was being escorted back to the jail at the end of trial one day when the entire jury saw him fully shackled and handcuffed.  Mr. Kryger states his counsel moved for a mistrial and the trial court denied the motion. He alleges his appellate counsel refused to raise this issue on appeal for him.

Docket No. 1, pp. 5-11.

Respondent now moves for judgment on the pleadings on Mr. Kryger's petition and dismissal without holding an evidentiary hearing.  See Docket No. 11.  As indicated above, Mr. Kryger has not opposed the motion.

**DISCUSSION**

**A.    Scope of a § 2254 Petition**

A state prisoner who believes he is incarcerated in violation of the Constitution or laws of the United States may file a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The Anti-Terrorism and Effective Death Penalty Act (AEDPA) constrains federal courts to exercise only a "limited and deferential review of underlying state court decisions."  Osborne v. Purkett, 411 F.3d 911, 914 (8th Cir. 2005).  A federal court may not grant a writ of habeas corpus unless the state court's adjudication of a claim "resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06, (2000). A federal habeas court may not issue the writ merely because it concludes the state court applied the clearly established federal law erroneously or incorrectly. Id. at 411. "Rather, that application must also be *unreasonable*." Id. (emphasis added).

The state court's factual findings are presumed to be correct, and a federal habeas court may not disregard the presumption unless specific statutory exceptions are met. Thatsaphone v. Weber, 137 F.3d 1041, 1045 (8th Cir. 1998); 28 U.S.C. § 2254(e). A federal habeas court must "more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair support' in the record." Marshall v. Lonberger, 459 U.S. 422, 432 (1983).

## B.    Judgment on the Pleadings Standard

This court recently addressed the proper standard applicable to motions for judgment on the pleadings under FED. R. CIV. P. 12(c):

> Courts deciding a Rule 12(c) motion are required to accept as true
> the well-pled allegations and must resolve all inferences in the
> non-moving parties' favor. Wishnatsky v. Rovner, 433 F.3d 608,
> 610 (8th Cir. 2006). However, this tenet does not apply to legal
> conclusions, "formulaic recitation of the elements of a cause of
> action," or factual assertions which are so indeterminate as to

require further factual enhancement.  <u>Braden v. Wal-Mart Stores,</u>
<u>Inc.</u>, 588 F.3d 585, 594 (8th Cir. 2009). . . . When considering a
motion for judgment on the pleadings, a court generally must
ignore all materials outside the pleadings.  <u>Porous Media Corp. v.</u>
<u>Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999).  However, courts
may consider "some materials that are part of the public record or
do not contradict the complaint . . . as well as materials that are
necessarily embraced by the pleadings."  <u>Id.</u>

<u>Union Ins. Co. v. Scholz</u>, 473 F. Supp. 3d 978, 982 (D.S.D. 2020).  The main

difference between a motion to dismiss under Rule 12(b)(6) asserting plaintiff

has failed to state a claim and a motion under Rule 12(c) is timing:  a Rule

12(b)(6) motion must be made before an answer is filed while a Rule 12(c)

motion can be made "after the pleadings have closed."  <u>Id.</u> at 981.

In addition to the pleadings, this court has taken judicial notice of the

underlying criminal, direct appeal, and habeas files in South Dakota state

court concerning Mr. Kryger.  <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181-82

(2011) (finding review under § 2254(d)(1) requires review of the state-court

record).  In addition, the court has taken judicial notice of the Google map

provided by respondent in his brief.  <u>See</u> Fed. R. Evid. 201.

## C.    Ineffective Assistance of Counsel—Claim One

### 1.    Standard for Ineffectiveness Claims

For his first habeas claim, Mr. Kryger asserts his trial counsel was

ineffective by being unprepared, failing to object to certain evidence, and failing

to ask relevant questions.  <u>See</u> Docket No. 1,  p. 5.  The Sixth Amendment of

the Constitution of the United States affords a criminal defendant with the

right to assistance of counsel.  U.S. Const. amend. VI.  The Supreme Court

"has recognized that 'the right to counsel is the right to effective assistance of

counsel.' " <u>Strickland v. Washington</u>, 466 U.S. 668, 698 (1984) (quoting

<u>McMann v. Richardson</u>, 397 U.S. 759, 771, n.14 (1970)).  <u>Strickland</u> is the

benchmark case for determining "if counsel's assistance was so defective as to"

violate a criminal defendant's Sixth Amendment rights and "require reversal of

a conviction."  <u>Id.</u> at 687.

"When a convicted defendant complains of the ineffectiveness of

counsel's assistance, the defendant must show that counsel's representation

fell below an objective standard of reasonableness."  <u>Id.</u> at 687-688.  The

defendant must also show that counsel's unreasonable errors or deficiencies

prejudiced the defense and affected the judgment.  <u>Id.</u> at 691.  The defendant

must show "there is a reasonable probability that, absent the errors, the

factfinder would have had a reasonable doubt respecting guilt."  <u>Id.</u> at 695.  In

sum, a defendant must satisfy the following two-prong test.  <u>Id.</u> at 687.

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the 'counsel'
> guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction or death sentence resulted from
> a breakdown in the adversary process that renders the result
> unreliable.

<u>Id.</u>

"There is a presumption that any challenged action was sound trial

strategy and that counsel rendered adequate assistance and made all

significant decisions in the exercise of professional judgment."  <u>Hall v.</u>

84

Luebbers, 296 F.3d 685, 692 (8th Cir. 2002) (quoting State v. Hall, 982 S.W.2d
675, 680 (Mo. 1998)).  It is the petitioner's burden to overcome this
presumption, and a "petitioner cannot build a showing of prejudice on a series
of errors, none of which would by itself meet the prejudice test."  Id. (citing
Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996)).

Counsel's conduct must be judged by the standards for legal
representation which existed at the time of the representation, not by
standards promulgated after the representation.  See Bobby v. Van Hook, 558
U.S. 4, 7-9 (2009).  " 'American Bar Association standards and the like' are
'only guides' to what reasonableness means, not its definition."  Id. (quoting
Strickland, 466 U.S. at 688).

The Supreme Court distinguishes between those cases in which the new
evidence "would barely have altered" the evidence presented and those that
would have had a reasonable probability of changing the result.  Porter v.
McCollum, 558 U.S. 30, 41 (2009).  In assessing the prejudice prong, courts
should consider "the totality of the available mitigation evidence—both that
adduced at trial, and the evidence adduced in the habeas proceeding"—and
"reweigh it against the evidence in aggravation."  Id. at 40-41 (quoting Williams
v. Taylor, 529 U.S. 362, 397-98 (2000)).  It is not necessary for the petitioner to
show "that counsel's deficient conduct more likely than not altered the
outcome" of her case, only that there is "a probability sufficient to undermine
confidence in [that] outcome."  Id. at 44.

Finally, "[i]neffective assistance of counsel is a mixed question of law and fact and thus on habeas review, a federal court is not bound by a state court's conclusion that counsel was effective." Whitehead v. Dormire, 340 F.3d 532, 537 (8th Cir. 2003). However, "state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d)." Id. (citing Strickland, 466 U.S. at 698). That is, "[a] state court's findings of fact are entitled to a presumption of correctness." Miller v. Dormire, 310 F.3d 600 (8th Cir. 2002). Additionally, "[j]udicial scrutiny of counsel's performance must be highly deferential," with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 698.

"The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is 'doubly' so." Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal citations omitted). "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Id. The inquiry when a Strickland claim is raised in a § 2254 petition is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

As the state habeas court recognized, a claim of ineffective assistance of trial counsel requires Mr. Kryger to show that his lawyers' representation of him fell below an objective standard of reasonableness and thereby prejudiced his case. Skillicorn v. Luebbers, 475 F.3d 965, 973 (8th Cir. 2007) (citing

86

Strickland, 466 U.S. at 687).  In a petition under 28 U.S.C. § 2254, however, Mr. Kryger must do more:  he must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner." Skillicorn, 475 F.3d at 973 (quoting Bell v. Cone, 535 U.S. 685, 699 (2002)).

### 2.      Counsel's Alleged Unpreparedness

Mr. Kryger asserts his counsel supplied him with an affidavit stating he was unprepared.  Docket No. 1, p. 5.  But, as the state habeas court observed, that is *not* what counsel swore to in his affidavit.  Instead, Mr. Kadi  stated that he had a jury trial involving twenty counts of aggravated assault involving another client and that the assault trial concluded just eighteen days before Mr. Kryger's jury trial started.  HC at pp. 111-12.  Mr. Kadi indicated that the time he spent in trial on his other matter was time he could not spend preparing for Mr. Kryger's trial.  Id.  Mr. Kadi never stated he was unprepared for Mr. Kryger's trial.  Id.

The court makes a number of observations.  First, eighteen days is nearly three weeks to prepare.  That is not an insignificant period of time. Furthermore, the state record indicates that the first four days of Mr. Kryger's trial were consumed with jury selection.  That means that counsel had time during those four days within which to continue to prepare substantively for Mr. Kryger's trial.  Also, Mr. Kryger had two lawyers:  Mr. Mark Kadi and Mr. Austin Vos.  There is no affidavit on record from Mr. Vos stating that he had been unable to prepare for Mr. Kryger's trial, or that he was unprepared.

But finally, and most significantly, Mr. Kryger's trial was originally set to take place in early July. Mr. Kadi filed numerous pretrial motions in May and June in preparation for the anticipated July start of trial, as detailed above in the FACTS section of this opinion. Some of the motions were boilerplate, but many display Mr. Kadi's thorough familiarity with the evidence, the law, and the nuances of each. A number of those pretrial defense motions were granted. In the spring, Mr. Kadi also litigated a mini-trial on the state's proffered 404(b) evidence from the 2008 incident involving T.N. and succeeded in keeping this evidence out at Mr. Kryger's trial. This was a major victory, for if the jury had heard about this earlier, nearly identical assault on a woman by Mr. Kryger in 2008, it surely would not have deliberated two days before concluding he was guilty of Kari's murder.

On the eve of Mr. Kryger's July trial date, the trial was continued to November. By that time, *Mr. Kadi had already done much of his trial preparation work in May and June.* If he had less time in October and November to prepare for Mr. Kryger's trial because of his assault trial, that time crunch had less impact because Mr. Kadi had already done the lion's share of trial preparation in the spring. His, and Mr. Vos', billing records show that counsel spent substantial time preparing Mr. Kryger's case for trial. HC at pp. 146-61 (over 800 hours). This court affirmatively finds that defense counsel were prepared to a sufficient degree to provide Mr. Kryger with constitutionally effective assistance of counsel.

Mr. Kryger never specifies what discrete actions or inactions occurred because of counsel's supposed unpreparedness. Vague, conclusory claims will not suffice for habeas relief. <u>Bryson v. United States</u>, 268 F.3d 560, 562 (8th Cir. 2001) (vague and conclusory habeas claims do not entitle a petitioner to relief); <u>Spillers v. Lockhart</u>, 802 F.2d 1007, 1009-10 (8th Cir. 1986) (same); <u>Creek v. Weber</u>, 598 F. Supp. 2d 1004, 120 (D.S.D. 2009) (quoting <u>Beavers v. Lockhart</u>, 755 F.2d 657, 663 (8th Cir. 1995) (same). But, in addition, <u>Strickland</u> requires Mr. Kryger to show prejudice. <u>Strickland</u>, 466 U.S. at 687. Even if the court were to find that counsel was ineffective due to being unprepared, the court would then be required to evaluate whether counsel's defalcations affected Mr. Kryger's trial. <u>Id.</u> The court cannot engage in any analysis of prejudice because Mr. Kryger never explains to the court *what* counsel did or did not do because they were unprepared.

This lack of specificity in Mr. Kryger's federal habeas petition also confounds this court's review of the state habeas court's decision. Is Mr. Kryger asserting the same allegations here as he did in state court or some different variation on his state habeas claims? Without specifics, this court cannot determine that and, without knowing whether the claim is the same factually as the state court claim, this court cannot determine whether the state court unreasonably applied federal law or made factual findings not supported in the record. For purposes of review, this court notes that the state court applied <u>Strickland</u> to this claim in the state habeas proceedings and found that Mr. Kryger's claim should be dismissed because he asserted no

facts in response to the respondent's summary judgment motion and the record otherwise showed substantial preparation on the part of counsel. HC at pp. 170-71. This was not an unreasonable application of Strickland, nor were the state court's findings unsupported in the record.

The court notes that respondent's motion in this court has been pending for over two months. Respondent attacks Mr. Kryger's claim for, among other things, its lack of specificity. See Docket No. 12, pp. 18-20. Mr. Kryger has had ample time to respond to respondent's motion for judgment on the pleadings and supply the missing facts/details supporting his claim. He has not done so.

### 3.    Counsel's Failure to Object or Question

Similarly, Mr. Kryger states that counsel was ineffective for failing to object to certain evidence and to ask certain questions. See Docket No. 1, p. 5. But he never specifies *which evidence* counsel should have objected to or *what questions* counsel should have asked. Id. Vague conclusory claims do not entitle Mr. Kryger to habeas relief. Bryson, 268 F.3d at 562; Spillers, 802 F.2d at 1009-10; Creek, 598 F. Supp. 2d at 120. Without specifics, the court cannot evaluate whether counsel's performance was deficient in any way and, if so, whether that deficiency prejudiced Mr. Kryger. Strickland, 466 U.S. at 687.

In the state habeas proceedings, the state court found that it was reasonable trial strategy not to object to the introduction of certain prosecution exhibits as the admission of these items furthered defense themes that the

90

state's investigation was incomplete, inaccurate, or inappropriately focused on Mr. Kryger.  HC at pp. 10-11.

The state court's decision was not an unreasonable application of Strickland nor were its factual findings lacking reasonable support in the record.  This magistrate judge respectfully recommends granting respondent's motion for judgment on the pleadings on Mr. Kryger's first habeas claim alleging ineffective assistance of counsel.

**D.    Confrontation Clause Violation—Claim Two**

In his second claim for relief, Mr. Kryger alleges the state trial court violated his confrontation clause rights when it limited his cross-examination of Brian Johnson.[11]  See Docket No. 1, p. 7.  The South Dakota Supreme Court issued the last reasoned decision on this issue, so the court examines whether that decision was an unreasonable application of federal law and whether the state court's factual findings enjoy reasonable support in the record.  See 28 U.S.C. § 2254(d)(1) & (2).

---

[11] Respondent argues that this claim, too, is vague and conclusory because Mr. Kryger never stated *in what way* his lawyer was limited in cross-examining Brian Johnson.  Docket No. 12, p. 33 (page 21 of respondent's brief).  This court has read the entire trial court criminal record.  Defense counsel's cross-examination of Brian Johnson was only limited in one way:  the trial court refused to allow any cross-examination on the subject of Brian's threats to harm Mr. Kryger and defense counsel while the criminal case against Mr. Kryger was pending.  Because the trial record makes obvious what Mr. Kryger's claim is, the court addresses it on the merits.  This contrasts with Mr. Kryger's ineffective assistance claims which are not obvious from the trial court record.

1.    **Federal Confrontation Clause Law**

The Confrontation Clause, embedded in the Sixth Amendment, grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. Art. IV.  This includes the right to physically confront adverse witnesses and to be provided the opportunity to cross-examine those witnesses.  Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986).  Chief among the purposes of cross-examination is to explore a witness' bias or motive in testifying.  Id. at 678-79.  Nevertheless, "trial judges retain wide latitude [under] the Confrontation Clause . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  Id. at 679.  "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Id. (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (*per curiam*) (emphasis in original).

In Van Arsdall, the trial court had precluded *all* cross-examination regarding a government witness' deal with the prosecution whereby the witness had a public drunkenness charge dismissed in return for his testimony in a murder trial.  Id.  This, the Delaware Supreme Court and the United States Supreme Court agreed was a violation of Van Arsdall's Confrontation Clause rights.  Id.  Where the two courts *disagreed* was that the Delaware court held such a constitutional violation required automatic reversal for a new trial,

while the Supreme Court held that the Court should evaluate whether the error

was prejudicial and, if so, whether the error was harmless.  Id. at 679-80.

In evaluating prejudice, a court should focus "on the particular witness,

not on the outcome of the entire trial."  Id. at 680.  A defendant asserting a

Confrontation Clause violation must show that the limits imposed on his cross-

examination of a particular witness prevented him from "expos[ing] to the jury

the facts from which jurors . . . could appropriately draw inferences relating to

the reliability of the witness."  Id. (quoting Davis v. Alaska, 415 U.S. 308, 318

(1974)).  By precluding all inquiry into the state's deal with the prosecution

witness, the Court concluded Van Arsdall had shown prejudice.  Id.

But because "the Constitution entitles a criminal defendant to a fair trial,

not a perfect one," the Court then analyzed whether the violation of Van

Arsdall's Confrontation Clause right was harmless because the constitutional

right involved was not a "fundamental" one.  Id. at 681-82.

Harmless error analysis requires consideration of the entire record.  Id.

at 681.  The court should consider "the importance of the witness' testimony in

the prosecution's case, whether the testimony was cumulative, the presence or

absence of evidence corroborating or contradicting the testimony of the witness

on material points, the extent of cross-examination otherwise permitted,

and . . . the overall strength of the prosecution's case."  Id. at 684 (citing

Harrington v. California, 395 U.S. 250, 254 (1969); and Schneble v. Florida,

405 U.S. 427, 432 (1972)).

93

Where identification of the defendant in a burglary case relied on the testimony of a sole witness, precluding cross-examination of that sole witness to show he was on probation for burglary and may have been motivated to identify the defendant in order to deflect attention from himself, or to ensure his probation statutus was not affected, was not harmless error. Davis, 415 U.S. at 320-21.

Although lower court decisions do not constitute "Federal law, as determined by the Supreme Court" as specified in § 2254(d)(1), the court examines some lower federal court decisions because how those courts have interpreted Supreme Court precedent sheds some light on whether the state court's interpretation was unreasonable.

Where two witnesses, fellow gang members and co-defendants of a criminal defendant, testified at a murder trial and the trial court limited cross-examination into the precise sentences they would receive for testifying against the defendant, the Eighth Circuit found the constitutional error, if any, in limiting cross-examination was harmless. Yang v. Roy, 743 F.3d 622, 629 (8th Cir. 2014). The court noted that, although the two witnesses' testimony was damaging to the defendant, it did not provide sufficient material information to affect the jury's verdict. Id. Also, the prosecution did not rely significantly on either witnesses' statement in closing argument. Id. Furthermore, the state trial court had instructed the jury that any testimony from a co-defendant must be corroborated by a non-involved witness, and both co-defendants' testimonies had been corroborated by several other witnesses. Id.

94

In another Eighth Circuit case involving testimony from co-conspirators, two witnesses had proffered with the government several times without mentioning the defendant.  United States v. Ragland, 555 F.3d 706, 712 (8th Cir. 2009).  The court allowed defense counsel to cross-examine as to some, but not all, of the other drug dealers identified by the witnesses in those proffers.  Id.  Also, one witness had been an ecstasy mule.  Id.  The court allowed cross-examination into this witness' involvement in heroin trafficking (the crime the defendant was charged with), but did not allow cross-examination into the witness' involvement with ecstasy.  Id.  The court allowed defense counsel to cross-examine both witnesses about their desire to obtain sentence reductions in return for their testimony against the defendant.  Id.

The Eighth Circuit held no Confrontation Clause violation had occurred because the defense was able to make its point regarding bias in the same way that the excluded testimony, if it had been admitted, would have done.  Id. at 712-13.  See also United States v. Santisteban, 501 F.3d 873, 879-80 (8th Cir. 2007) (Confrontation Clause violation, if one occurred, was harmless error because defense counsel was able to demonstrate the witness' bias by revealing the terms of the witness' federal plea agreement, without being able to cross-examine the witness about pending state charges).

Similarly, in United States v. Drapeau, 414 F.3d 869, 875-76 (8th Cir. 2005), the court found no basis for reversal on Confrontation Clause grounds where the district court prevented cross-examination of a witness, Big Eagle, about her familial connections to the United States Attorney's Office and

95

the FBI.  But it did allow cross-examination about the fact that Big Eagle never faced criminal charges, even though drugs were found in her vehicle, she hoped by testifying to fend off any drug charges, and she had admitted to involvement in drug activity and had continued using drugs after she began cooperating with the government.  Id.

In a case with facts similar to Mr. Kryger's case, a defendant facing murder and kidnapping charges was identified by the prosecution's sole eyewitness, Carla.  Newton v. Kemna, 354 F.3d 776, 778-79 (8th Cir. 2004).  At trial, the state court had refused to grant defendant access to Carla's psychiatric records and precluded cross-examination of Carla on her post-offense psychological issues, including a suicide attempt.  Id. at 779.  Defense counsel *was* permitted to cross-examine Carla about her use of crack cocaine on the day of the crime, her use of alcohol on the night of the incident, and whether she was taking any psychotopic medications on the day of the event. Id. at 780.  Other witnesses at trial were permitted to give testimony as to Carla's reputation for truth-telling and her use of drugs.  Id.

The Eighth Circuit observed that the state trial court imposed the limitations on cross-examining Carla to prevent irrelevant testimony and jury confusion.  Id. at 781.  Because counsel had been given the opportunity to discredit Carla through other avenues than presenting her mental state after the events had occurred, the court found no habeas relief was merited on Newton's Confrontation Clause claim.  Id. at 781-82.

## 2.    Application of the Law to Mr. Kryger's Claim

As noted above, although Mr. Kryger raised his Confrontation Clause violation in his direct appeal, the state supreme court did not discuss or cite any federal cases or law, but only discussed state cases.  Kryger, 907 N.W.2d at 808-09.  The state court recognized that a trial court may reasonably limit cross-examination consistent with the Confrontation Clause, but did not explore what the limits are on that discretion.  Id.  Similarly, the court recognized that Confrontation Clause violations are subject to a prejudice analysis, but did not mention the harmless error part of the analysis.  Id.  Therefore, this court applies the federal law to Mr. Kryger's claim and evaluates whether the result reached by the state court constitutes an unreasonable application of federal law.

Here, the subject of Brian Johnson's testimony was his knowledge of Kari's habits and the home she lived in, his observations and actions upon entering Kari's house after the removal of her body, and his observations of Kari's fingernails at the funeral.  CR at pp. 2829-39 (JTT Vol. 6).  Brian's testimony was one of six witnesses' testimony about these subjects.  He testified to the smell of bleach, the absence of towels and rugs in the bathroom, the fact that no family members had used any cleaning supplies after entering Kari's house, the fact that Kari's purse was missing, and that he had admonished Kari in the past to lock her front door, but that she continued to leave it unlocked.  Id.  Multiple other witnesses testified to these same facts, both other family members as well as first responders and police.

97

The subject matter that Mr. Kryger was precluded from inquiring into on cross-examination was Brian's threats toward Mr. Kryger and his counsel *after* the events to which he testified had occurred.[12]  During his testimony, it was established that he was Kari's sister and that the two of them had been very close.  Id. at p. 2829.  In fact, Brian testified his mother had died when Brian was nine years old and Kari was like a mother to him after that.  Id. at p. 2830.  As adults, Brian testified they talked a lot with each other.  Id.  Brian was the owner of the house Kari lived in and he gave the house to her.  Id.  Although defense counsel was permitted to inquire into Brian's bias based on his relationship to Kari, no questions along these lines were asked during cross-examination.  Id. at pp. 2840-43.

The first issue is whether the trial court's limitation of Brian's testimony was a Confrontation Clause violation.  The court concludes it was not.  The gist of the precluded cross-examination would have tended to show that Brian was biased due to his close relationship with his sister, Kari.  The prosecutor presented all that information in Brian's direct examination—they were siblings, Kari was a mother figure to Brian, Brian gave Kari the house she was living in, and the two talked frequently.  Id. at 2829-30.  As the federal case law

---

[12] After the 404(b) hearing, Mr. Johnson told media reporters that if Mr. Kryger "gets out," Mr. Johnson would "feed him to some hogs . . . after I torture him for months. . . . If he gets out . . . I'm going to kill him.  That's a fact; they'll have to find a body."  CR at p. 437.  Mr. Johnson told defense counsel he couldn't understand how he could represent Mr. Kryger and that counsel better hope he was a light sleeper.  Id. at p. 436.  In a Facebook post Mr. Johnson wrote that for a birthday present, he'd like to have "chris kryger and his whore mother tied to a bar stool at the log cabin bar, and then set the place on fire."  Id. at p. 439.

discussed above demonstrates, when a criminal defendant is able to illustrate the witness' bias through routes other than the one that was precluded, no Confrontation Clause violation is found.  See Ragland, 555 F.3d at 712-13; Santisteban, 501 F.3d at 879-80; Drapeau, 414 F.3d at 875-76; Newton, 354 F.3d at 780-82.  Furthermore, the excluded line of cross-examination concerned Brian's state of mind *after* the events about which he testified.  The Eighth Circuit similarly approved such limitations on cross-examination about a witness' post-event mental state in the Newton case.  Newton, 354 F.3d at 780-82.

The second issue the court addresses is prejudice,[13] focusing on the particular witness, not on the outcome of the entire trial.  Van Arsdall, 475 U.S. at 680.  Mr. Kryger must show that the limits imposed on his cross-examination of Brian prevented him from "expos[ing] to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."  Id. (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).  The court cannot say that there was no prejudice.  Had the jury known that Brian threatened to torture and kill not only Mr. Kryger, but his counsel and his mother too, if Mr. Kryger was released or not convicted, this court believes the jury would have had a very different impression of Brian.  The impression the jury would probably had of Brian from the testimony presented was that he was grievously hurt by his sister's death.  But threats of the nature Brian made

---

[13] The court addresses prejudice even though it did not find a constitutional violation for the sake of completeness in the event a reviewing court does not agree with this court on the first issue.

99

that were kept from the jury probably would have made the jury recoil, even if they found the threats understandable from a human perspective.

The last issue is whether the error, if one occurred, was harmless.  On this point the court considers the entire record.  Van Arsdall, 475 U.S. at 681. The court should consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." Id. at 684 (citing Harrington, 395 U.S. at 254; Schneble, 405 U.S. at 432).

Even if the jury completely discredited Brian's testimony, it would have had no discernable effect on the jury's verdict.  Brian was one of six friends and family members who testified about the smell of bleach and the missing items from Kari's home.  All family members testified that no one used any cleaning supplies when they entered Kari's house.  In addition to Brian's testimony being corroborated by other family members and friends, third parties such as the police who returned to Kari's home after her body was removed also testified to the smell of bleach and the missing items.  Nick and Paetyn corroborated Brian's testimony that Kari usually left her front door unlocked.

The wider picture of the evidence presented at trial showed that Kari had been injured during her murder and rape as evidenced by several bruises and marks on her body, Mr. Kryger had had sexual intercourse with Kari as evidenced by his sperm cell DNA being found inside her vagina, and she had

been strangled to death by a ligature. The mosque video showed Mr. Kryger arriving at the house shortly after 11:30 p.m. on March 14, leaving in Kari's vehicle at 2:30 a.m. on March 15, reparking Kari's vehicle at 3:30 a.m. on the 15th, and then leaving on his bike immediately thereafter. Other evidence showed he had a sudden influx of cash on the morning of the 15th before he cashed his paycheck and he had fresh scratches on his chest and bicep.

This court concludes that the violation of Mr. Kryger's Confrontation Clause rights, if it occurred, was harmless error. Accordingly, the South Dakota Supreme Court's conclusion to the same effect was not an unreasonable application of federal law nor an unfounded factual finding. This magistrate judge therefore respectfully recommends granting respondent's motion for judgment on the pleadings as to Mr. Kryger's second claim for habeas relief.

**E.    Sufficiency of the Evidence—Claim Three**

### 1.    Standard for a Due Process Sufficiency of Evidence Claim

In his third claim for relief, styled as "reasonable doubt," the court finds that Mr. Kryger is in fact raising a sufficiency of the evidence claim.[14]  The Supreme Court has held that "a state prisoner who alleges that the evidence in

---

[14] Respondent argues that Mr. Kryger's sufficiency of the evidence claim which he raised in his direct appeal is slightly different from the claim raised herein and, therefore, is not exhausted.  Docket No. 12, p. 36 (page 24 of respondent's brief).  The court agrees that Mr. Kryger's claim in his direct appeal was not couched in constitutional terms as his claim before this court is (and must be).  However, the two claims are so similar that the court concludes Mr. Kryger has met the exhaustion requirement.  For that reason, the court addresses the claim on the merits, as specifically invited by respondent to do.  Id.

support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." <u>Jackson v. Virginia</u>, 443 U.S. 307, 321 (1979).

This is because the Constitution requires proof of guilt beyond a reasonable doubt for a criminal conviction. <u>In re Winship</u>, 397 U.S. 358, 364 (1970). This requirement stems from the Due Process clauses of the Fifth and Fourteenth Amendments. <u>Id.</u> The Due Process clause requires proof beyond a reasonable doubt in support of every essential element of the crime of conviction. <u>Jackson</u>, 443 U.S. at 313-14. Thus, in order to satisfy the Due Process clause, the jury has to have been instructed on the beyond-a-reasonable-doubt standard *and* the jury has to have rationally applied that standard to the evidence. <u>Id.</u> at 317-19. When a federal court reviews a sufficiency of the evidence claim as to a state court conviction, the appropriate standard to apply is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319, 324.

State court findings of fact are presumed correct in federal habeas actions unless the findings are based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. <u>See</u> 28 U.S.C. § 2254(d)(2). When the record contains evidence with conflicting inferences, the federal court must presume that the jury resolved the evidentiary conflicts in favor of the state even if the record does not

102

affirmatively show the jury did so.  <u>Jackson</u>, 443 U.S. at 326.  The prosecution need not have ruled out every hypothesis except that of the petitioner's guilt beyond a reasonable doubt.  <u>Id.</u>  A state appellate decision regarding sufficiency of the evidence is entitled to deference.  <u>Id.</u> at 323.  <u>See also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 783 (1990) ("a federal court should adhere to the <u>Jackson</u> standard even when reviewing the decision of a state appellate court that has independently reviewed the evidence, for the underlying question remains the same").

A state prisoner asserting a sufficiency of the evidence claim in federal habeas court faces a high bar; such claims are subjected to dual deference. <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (*per curiam*).  First, there is deference given to the jury's verdict because it is the jury's primary responsibility to decide "what conclusions should be drawn from evidence admitted at trial."  <u>Id.</u>  A reviewing court on direct appeal may only overturn a jury verdict if "no rational trier of fact could have agreed with the jury."  <u>Id.</u> (quoting <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (*per curiam*)).  Second, in a § 2254 proceeding this court must accord the state state court's decision deference.  <u>Id.</u>  This court may not overturn a state court "decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.' "  <u>Id.</u> (quoting <u>Cavazos</u>, 565 U.S. at 2).

Federal courts look to state law for "the substantive elements of the criminal offense."  <u>Id.</u> at 2064.  But the question of whether the quantum of

103

evidence adduced at trial satisfies the Due Process Clause is "purely a matter of federal law." Id. Mr. Kryger is serving a mandatory life sentence for first-degree murder, so the court first examines whether the evidence was sufficient to support the jury's verdict on that charge. If so, the court need not examine the other charges of burglary and rape and any insufficiency of the evidence on those claims would be rendered moot if the murder conviction is sustained. Similarly, Mr. Kryger was convicted of several counts of first-degree murder, so the court begins by examining Count 1. If Count 1 was sustained by the evidence, the court need not examine each of the other convictions for first-degree murder.

The South Dakota Supreme Court did not discuss any federal law when it decided Mr. Kryger's sufficiency of the evidence claim. Kryger, 907 N.W.2d at 814-15. To be sure, Mr. Kryger did not couch this claim in constitutional clothing on his direct appeal, so the state court had no reason to discuss the Due Process clause. This court will proceed to examine the evidence, apply federal law to that evidence, and evaluate whether the state court's conclusion is compatible with that law.

### 2.   The Jury was Properly Instructed

First, the court must ascertain whether the jury was properly instructed on the beyond-a-reasonable-doubt standard. The trial court's jury instruction provided as follows:

> Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the state's proof must

be more powerful than that.  It must be beyond a reasonable
doubt.

    Proof beyond a reasonable doubt is proof that leaves you
    firmly convinced of the defendant's guilt.  There are very few things
    that we know with absolute certainty.  In criminal cases the law
    does not require proof that overcomes every possible doubt.  If,
    based on your consideration of the evidence, you are firmly
    convinced the defendant is guilty of the crime charged, you must
    find the defendant guilty.  If, on the other hand, you think there is
    a real possibility the defendant is not guilty, you must give the
    defendant the benefit of the doubt and return a verdict of not
    guilty.

CR at p. 530.  Furthermore, the trial court properly instructed the jury it must

find each element of the crime charged in Count 1 proved beyond a reasonable

doubt.  CR at p. 538.    This court concludes the jury was properly instructed

that it must find guilt beyond a reasonable doubt.

### 3.    Sufficiency of the Evidence

    Under South Dakota law, the elements of first-degree murder as charged

in Count 1 of the indictment in Mr. Kryger's case are:  (1) Mr. Kryger caused

the death of Kari Kirkegaard and (2) he did so with a premeditated design to

effect the death of Kari and without authority of law.  Id.;  see SDCL § 22-16-4.

### i.    Identity

    Mr. Kryger has never disputed at any level of litigation—and does not

dispute in this court—that Kari was murdered.  There is good reason

Mr. Kryger has never disputed that Kari's death was brought about

intentionally by another human:  the evidence was indisputable.  She had

ligature marks on her neck from being strangled.  Her hyoid bone and thyroid

cartilage were crushed.  She had multiple bruises and wounds on her body

evidencing a struggle. The only questions at trial were (1) identity—was it Mr. Kryger who killed her? And (2) whether Mr. Kryger acted with premeditation.

The identity evidence adduced at trial that Mr. Kryger brought about Kari's death was powerful. He was identified as the person in the mosque video by four independent persons who did not know of each other: Michael Miller; Mr. Kryger's ex-girlfriend Jeanette Gaul; his then-girlfriend Lori Nagel; and his uncle and employer, Richard Foster, although Mr. Foster later recanted his identification. Each of these four persons stated two bases for identifying Mr. Kryger as the man in the video: his manner of walking and his clothing.

As to the latter, evidence was introduced through Lori Nagel that Mr. Kryger had a uniform of sorts when it was cold. Mr. Kryger would wear a stocking cap, gloves, a hooded sweatshirt, a blue plaid flannel coat on top of the sweatshirt, and jeans. Ms. Nagel had two photos of Mr. Kryger on her cell phone taken from two different locations in which Mr. Kryger was wearing this clothing. The man depicted in the mosque video was wearing the same clothing.

At trial, defense counsel insisted that plaid flannel jackets are very commonplace in Sioux Falls and in fact, numerous witnesses and persons connected to the case owned a flannel jacket. But each of the four witnesses also identified the gait of the man in the mosque video, *the way he walked,* as being distictive and as being the same as Mr. Kryger's walk. One might change one's coat at the drop of a hat, but how would a complete stranger—who just

106

happens to be the same size and build as Mr. Kryger dressed in identical clothing—imitate Mr. Kryger's manner of walking?  It is highly unlikely. Presumably the individual on the video had no idea he was being recorded by a surveillance camera or he would have taken steps to see that his actions escaped the view of the cameras.

Mr. Kryger argues the quality of the mosque video was so poor that no one could have identified him from it.  But four witnesses independently identified Mr. Kryger from that video.  Furthermore, the video showing Mr. Kryger walking across the bank lobby to the teller station in February and March was introduced at trial.  From that video that assuredly did depict Mr. Kryger, the jury could compare Mr. Kryger's appearance and gait at the bank with the appearance and gait of the man in the mosque video and assess for themselves how reliable the four witnesses' identifications were.

Other evidence presented at trial collaborated Mr. Kryger's identity as the murderer.  The murder occurred in mid-March in Sioux Falls, a time of year when temperatures can still be very cold.  The man on the mosque video was riding a bicycle—at night.  Mr. Kryger had no motor vehicle and used a bike to get around town.  He admitted to police that he was riding his bike around Kari's neighborhood the night of the murder.

Kari's purse was found to be missing from her home the day her body was found.  Mr. Kryger, who was known to never have much money to spare, suddenly had a significant amount of money on the morning of March 15.

Enough money that he could buy his girlfriend an engagement ring and replace the cell phone he had smashed the night before outside the billiards parlor.

The most significant evidence as to identity is that Mr. Kryger's sperm cell DNA was found in Kari's vagina. This was damning evidence because Mr. Kryger told police that since he started dating Ms. Nagel he had never slept with anyone else. Defense counsel tried to suggest in closing argument that Mr. Kryger had consensual sex with Kari but just didn't know Kari's name. But Mr. Kryger adamantly denied having slept with anyone besides Ms. Nagel when he spoke to police. Furthermore, there were no phone calls, texts, or emails between Kari and Mr. Kryger.

Finally, there was no rational time or occasion during which Mr. Kryger and Kari could have had consensual sex, as defense counsel tried to suggest happened. Kari left the pizza restaurant minutes before 10:00 p.m. on March 14 (as shown in surveillance video from the restaurant) and arrived home at approximately 10:00 p.m. (as shown on the mosque video). She had no time during that interval to encounter Mr. Kryger (whom she had never met before), join him for a tryst at his house at Burnside Trailer Park (Mr. Kryger suggested this is where the consensual sex took place), and return to her home by 10:00 p.m. when the mosque video showed her arriving home. Once home, she never left.

Mr. Kryger makes much of the bicyclist seen in the Family Market video, defense Ex. G, and argues that it was him in Ex. G and therefore shows he was not at Kari's house at the same time that the supposed other murderer was

parking Kari's vehicle in her driveway. First, the court has watched both the mosque videos (state's Exs. 46 & 47) and the bicyclist in those videos is riding a bike with reflectors on it. The bike being ridden in the Family Market video did not have reflectors on it. <u>See</u> defense Ex. G. The photo of Mr. Kryger's blue Huffy bike shows it had reflectors on it. <u>See</u> state's Ex. 99. So this court concludes the bicyclist in the Family Market video was not Mr. Kryger. But, in any event, this was an issue of conflicting evidence for the jury to resolve. he jury was properly instructed by the trial court and there is no indication they failed to follow the court's instructions.

The evidence was inescapable that the man in the mosque video who rode his bike up to Kari's house at 11:30 p.m. on March 14 was the murderer. Although the driver of Kari's vehicle cannot be seen, the same man who rode his bicycle is seen walking in front of the mosque cameras at 2:30 a.m. and 3:30 a.m., showing that this man was at Kari's house for approximately three hours before leaving in her vehicle and then returning an hour later. The jury concluded the man in the video was Mr. Kryger. That conclusion was supported by ample evidence of independent identifications by four persons based on his gait and clothing, the fact he was riding a bike, and the fact that his sperm was found inside Kari's body. Certainly the mosque videos are not the very ideal of clarity, but they are clear enough to identify clothing and a distinctive gait. The court now turns to the issue of premeditation.

### ii.    Premeditation

South Dakota law defines premeditation by statute:

> The term, premeditated design to effect the death, means an intention, purpose or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed. A premeditated design to effect death sufficient to constitute murder may be formed instantly before committing the act.

SDCL § 22-16-5.

The coroner, Dr. Snell, testified that it would take approximately ten to fifteen seconds for a person being strangled by a ligature to lose consciousness. CR at p. 1105 (JTT Vol. 9). It would take approximately three to five minutes of continuous pressure on the ligature to kill the person. Id. In order to cause the petechial hemorrhages present in Kari's case (on her face, the whites of her eyes, and the insides of her lips), approximately thirty-three pounds of pressure would have had to have been applied to the ligature. Id. at p. 1106.

From this evidence the jury was more than justified in finding premeditation beyond a reasonable doubt. Mr. Kryger would have had to have placed the ligature around Kari's neck, apparently while she struggled against him (as evidenced by the bruises and injuries on her body as well as his), and hold it in place applying thirty-three pounds of pressure for three to five minutes. The application of that amount of force for that extended of a period of time is more than sufficient to have formed an intention to kill that was distinct and existing in Christopher Kryger's mind before Kari actually expired.

### 4. Irrelevant Evidence

Mr. Kryger's third claim also includes specific discussion of evidentiary items. Mr. Kryger asserts the police believed he cleaned the crime scene with

bleach, but Mr. Kryger correctly points out that the initial persons on the scene did not report or detect a smell of bleach or cleaning supplies. Docket No. 1, p. 8. But the prosecution's evidence showed the bleach smell was not present until after the bathtub had been drained. That explained why the smell was not there when Kari's body was still in the tub and the tub was full of water, and why the smell was detected by everyone who entered the house after the water in the tub was drained and the body removed. In any case, the evidence about the bleach smell is not so pivotal to the evidence adduced at trial that this court can conclude that "no rational trier of fact could have agreed with the jury." Coleman, 566 U.S. at 651.

Mr. Kryger also asserts the prosecution introduced numerous items of evidence that were never tied to him. Docket No. 1, p. 8. He specifically complains about the admission of the Coke Zero can, the black fleece hooded sweatshirt, empty bottles of cleaning supplies, and two gauze squares. Id. at pp. 8-9. None of these items had Mr. Kryger's fingerprints or DNA on them.

It is unclear to the court what point Mr. Kryger is making. The murderer obviously scrupulously cleaned up the crime scene to eliminate any fingerprints or DNA from the area. The police took "everything that wasn't nailed down" from Kari's house and examined it for clues. CR at p. 1541 (JTT Vol. 12). They found no fingerprints from anyone other than Kari anywhere in the house. Not everything was or could have been tested for DNA, but of the items tested, the only DNA found to belong to Mr. Kryger was inside Kari's body.

111

It is undisputed, even by Mr. Kryger today, that *someone* murdered Kari. Therefore, if that someone's fingerprints and DNA were not found at the murder scene, it follows that the murderer took steps to prevent that evidence from landing there, or took steps to remove the evidence after the murder. Defense counsel used this mountain of evidence to suggest the police had charged the wrong man, so it is hard to see how the admission of this evidence hurt Mr. Kryger.

As for the black fleece hooded sweatshirt, this was part of the "uniform" Ms. Nagel identified Mr. Kryger as wearing during cold weather. The fact that no DNA was found on the sweatshirt does not make the sweatshirt irrelevant. It shows Mr. Kryger owned clothing similar to that depicted on the mosque video. The video was infrared, so black showed up in the video as glowing white.

The fire pit was also never specifically tied to Mr. Kryger through DNA or fingerprints, but it was relevant. Mr. Kryger admitted to Mr. Miller that he burned his flannel coat. The burn site was only a few blocks away from Kari's house. It was fresh in and around the time when Kari was murdered. It did not have the appearance of kids partying as no beer cans or other alcoholic containers were found nearby. The forensic scientist from the state crime lab testified that items from a fire, even if they are not completely incinerated, usually will not yield DNA. See CR at p. 1289 (JTT Vol. 11). That is because the fire itself destroys DNA, but so does the heat from the fire. Id.

112

The court finds no constitutional errors in the trial court's admission of these items. With few exceptions, the items were accepted into evidence with no objection from defense counsel. The introduction of the items played into one of defense counsel's themes at trial: look at this mountain of evidence and none of it (none but the rape kit evidence), tied Mr. Kryger to the murder of Kari. The existence of these items in evidence at the trial did not preclude the jury from finding Mr. Kryger's guilt beyond a reasonable doubt.

In conclusion, viewing the evidence in the light most favorable to the verdict, and knowing that the jury had been properly instructed on the elements of the crime and the prosecution's burden of proof, and granting the dual deference due to the jury and the South Dakota Supreme Court, this court finds no merit to Mr. Kryger's Due Process challenge to the sufficiency of the evidence. The jury's verdict was not such that "no rational trier of fact could have agreed with the jury." Coleman, 566 U.S. at 651. The state court's conclusion was not an unreasonable application of federal law nor were its factual findings lacking support in the record. The state court's decision was not "objectively unreasonable." Id. This magistrate judge respectfully recommends that respondent's motion for judgment on the pleadings be granted as to Mr. Kryger's third claim for habeas relief.

**F.    Jury Exposure to Mr. Kryger in the Hallway—Claim Four**

Mr. Kryger's fourth claim is that the jury saw him fully shackled and handcuffed, thereby causing him prejudice. Docket No. 1, p. 11. He alleges he

asked appellate counsel to raise this issue in his direct appeal, but counsel refused to do so.  Id.  Mr. Kryger's factual assertions are belied by the record.

Counsel did raise the issue of the jury's exposure to Mr. Kryger on direct appeal.  SDSCT at pp. 35-36 (pp. 27-28 of appellant's brief).  Because there is no factual basis for this allegation, the court does not address whether counsel had an obligation to raise the issue on appeal.  The South Dakota Supreme Court found no grounds for reversal of the trial court's decision not to grant a mistrial on this issue.  Kryger, 907 N.W.2d at 812-13.

Mr. Kryger's factual account of the jury exposure is also different from what the record establishes.  The jury exposure occurred in the hallway after 10:00 p.m. in the courthouse at the end of the jury's first day of deliberations.  The trial court made a careful record of what happened so it would be available for subsequent review.

The bailiff testified on the record, subject to cross-examination, that he placed the jury on the elevator on the fifth floor of the courthouse.  CR at pp. 1566-71 (JTT Vol. 13).  Meanwhile Mr. Kryger, in civilian clothing, was being escorted by two law enforcement officers, also in civilian clothing, down the stairs from the fifth floor to the fourth floor, where they entered the hallway.  Id.  Mr. Kryger was not wearing leg shackles.  Id.  The officers did not have on badges, weapons, or anything else that would identify them as law enforcement officers.  Id.

A cleaning person on the fourth floor pushed the elevator button and the elevator doors opened as Mr. Kryger was passing by.  Id.  The bailiff shielded

114

the jury with his body as best he could from seeing Mr. Kryger.  Id.  The bailiff could not see any handcuffs on Mr. Kryger.  Id.  One of the officers was flipping a set of keys in his hand, making a clanking noise, and one juror remarked to the bailiff, "oh, you must have heard them coming."  Id.  The bailiff said it happened very fast.  Id.

Thus, Mr. Kryger's assertion that he was fully shackled is false.  He was wearing no shackles according to the state court record.  He may or may not have been wearing handcuffs—the bailiff said it happened so fast he could not see any handcuffs.  It is doubtful the jury saw much of anything at all as the bailiff spread himself out in front of the doors to prevent the jury from viewing Mr. Kryger.

### 1.    Standard Applicable Under AEDPA

Respondent argues in his motion for judgment on the pleadings that there is no Supreme Court precedent on point as to the issue of a criminal defendant being exposed to his jury while in shackles outside the courtroom and after court proceedings have adjourned for the day.  Docket No. 12, pp. 60-64 (pp. 48-52 of respondent's brief).  In such cases in which there is no clearly established Supreme Court precedent, respondent argues this court must blindly affirm the state court's decision.  Id.

The case respondent relies on for the latter proposition is Williams v. Taylor, 529 U.S. 362 (2000).  Williams was a plurality decision appealing a § 2254 case with Justice Stevens rendering the opinion of the Court as to parts I, III and IV.  Id. at 367.  The passage respondent cites to is page 380 of the

115

<u>Williams</u> opinion, which is part II of Justice Stevens' opinion.  Docket No. 12, p. 60 (p. 48 of respondent's brief) (citing <u>Williams</u>, 529 U.S. at 380).  As indicated above, Justice Stevens *did not* render the opinion of the Court as to part II.  So the passage cited by respondent does not constitute Supreme Court precedent.

The opinion of the Court as to part II was rendered by Justice O'Connor. <u>Id.</u> at 399.  Justice O'Connor traced the history of federal court review of state court legal interpretations of federal law both before and after AEDPA.  <u>Id.</u> at 399-404.  She concluded that, prior to AEDPA, federal courts made an independent determination of what federal law was and then decided the case accordingly.  <u>Id.</u>  Justice Stevens would have held that AEDPA did not change federal court review of legal decisions made by state courts based on federal law.  <u>Id.</u> at 380 (indicating that AEDPA merely codified prior Supreme Court precedent) (Stevens, J.).

However, Justice O'Connor (i.e. a majority of the Court), held that AEDPA was intended to and did materially change preexisting habeas law.  <u>Id.</u> at 405. Under AEDPA, a federal court may only reverse a state court's decision on a point of federal law if that state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." <u>Id.</u> at 404 (quoting 28 U.S.C. § 2254(d)(1)).  "Contrary to" means the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or the state court confronted facts materially indistinguishable from a Supreme Court precedent and came to an opposite result.  <u>Id.</u> at 405, 412-13.  An unreasonable application is not simply an

116

"incorrect" application of federal law. Id. at 410-11. The federal habeas court should apply an objective, not subjective, standard of unreasonableness. Id. at 409.

The Court discussed the problematic situation that might arise when a state court is required to extend an existing Supreme Court precedent into an area as yet unaddressed by the Court (or refuse to so extend). Id. at 408-09. However, the Court noted that Williams did not present this scenario. Id. at 409. Therefore, the Court declined to address that situation. Id. (stating, "[t]oday's case does not require us to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1). For now, it is sufficient to hold that when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause.").

"Clearly established Federal law, as determined by the Supreme Court" requires that federal habeas courts compare state court adherence only to holdings of Supreme Court cases, not *dicta* from those cases, and only holdings in existence at the time the state court rendered its decision. Id. at 412.

In a case subsequent to Williams, Wright v. Van Patten, 552 U.S. 120, 125-26 (2008), the state court had analyzed an ineffective assistance claim where the habeas petitioner asserted that his counsel's participation by speakerphone at a critical stage of trial resulted in the "total absence" of counsel such that prejudice need not be shown under Strickland. The Court

117

held that "[b]ecause our cases give no clear answer to the question presented, let alone one in [the habeas petitioner's] favor, 'it cannot be said that the state court unreasonably applied clearly established federal law.' " Id. at 126 (internal citations omitted).  The Court held that "[u]nder the explicit terms of § 2254(d)(1), therefore, relief is unauthorized."  Id.

### 2.  Supreme Court Precedent and Lower Court Decisions

The Supreme Court has held that "the Constitution forbids the use of visible shackles during the penalty phase [of a capital case], as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial."  Deck v. Missouri, 544 U.S. 622, 624 (2005).  The Deck Court noted that the rule against shackles on a criminal defendant at trial had ancient roots in the common law, but that same law did not apply the rule to arraignments or other like proceedings before the judge.  Id. at 626.  It was meant to protect defendants appearing at trial before a jury.  Id.

The Court outlined three reasons in support of the no-shackling rule: (1) when a jury sees a defendant in shackles it "undermines the presumption of innocence," (2) shackles "interfere with [an] accused's 'ability to communicate' with his lawyer," and (3) it provides a dignified judicial process.  Id. at 630-31 (internal citations omitted).

The rule, which has its roots in the Due Process clause, nevertheless does not preclude having "uniformed security personnel sit in the front row of the [court's gallery]."  Id. at 628.  See also Holbrook v. Flynn, 475 U.S. 560,

118

571-72 (1986).  In such a case where a trial court feels the necessity for having guards identifiable as such in the courtroom, the constitutional question posed is whether what the jurors saw "was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." Holbrook, 475 U.S. at 572.  The Court has also held a defendant may be bound and gagged during his trial if he is obstructing the trial and refuses to conduct himself decorously or poses a danger to himself or others.  Illinois v. Allen, 397 U.S. 337, 344 (1970).

Although lower court decisions do not constitute "Federal law, as determined by the Supreme Court" as specified in § 2254(d)(1), the court examines lower federal court decisions because how those courts have interpreted Supreme Court precedent sheds some light on whether the state court's interpretation was unreasonable.

In United States v. Carr, 647 F.2d 867, 868 (8th Cir. 1981) (*per curiam*), the defendant raised a Due Process claim based on the fact that some jury panel members standing in a hallway outside the courtroom may have glimpsed defendant in handcuffs and a waist chain as the marshals walked him through the courthouse.  The court held that the facts did not give rise to presumed prejudice, so Carr was required to affirmatively demonstrate actual prejudice.  Id.  Carr did not do so and the court affirmed the lower court's denial of Carr's motion for a mistrial.  Id.

119

In <u>United States v. Olano</u>, 62 F.3d 1180, 1190 (9th Cir. 1995), the court rejected a defendant's Due Process claim after the jury briefly witnesses him in handcuffs as he entered the courtroom.  The court noted that the district court made factual findings that no juror actually saw the defendant in restraints, but that even if the jury had, the defendant must show actual prejudice.  <u>Id.</u> Olano did not examine the jury and produced no other evidence tending to show prejudice.  <u>Id.</u>

In <u>United States v. Morales</u>, 758 F.3d 1232, 1236-37 (10th Cir. 2014), the defendant alleged his Due Process rights were violated when marshals walked him through the hallway in handcuffs and several jurors were near the elevator.  The court noted <u>Deck</u> was of questionable applicability because Morales was only shackled in the common areas of the courthouse, never in the courtroom.  <u>Id.</u>  The court held that "an isolated view by jurors of a defendant in handcuffs does not justify a new trial in the absence of a showing of actual prejudice."  <u>Id.</u> at 1237 (quoting <u>United States v. Simpson</u>, 950 F.2d 1519, 1522 (10th Cir. 1991)).

Similarly, the Third Circuit held that a defendant's Due Process rights were not violated when a juror had a "brief, inadvertent observation of [the] defendant in handcuffs."  <u>United States v. Fredericks</u>, 684 Fed. Appx. 149, 164-65 (3d Cir. 2017).  The defendant failed to show actual prejudice and the trial court had given an appropriate (though general) jury instruction telling the jury not to draw any inferences from security practices in the courthouse.  <u>Id.</u> at 165.  <u>See also United States v. Matthews</u>, 545 F.3d 223, 228 n.5 (2d

120

Cir. 2008) (citing <u>United States v. Hurtado</u>, 47 F.3d 577, 581-82 (2d Cir. 1995) (holding a juror's brief glimpse of a defendant in prison clothes and handcuffs while he was escorted through the hallway did not violate the defendant's Due Process rights).

Here, the state court reviewed this issue only for an abuse of discretion and did not mention any federal law. <u>Kryger</u>, 907 N.W.2d at 812-13. Nonetheless, the ultimate conclusion by the state court is congruent with federal law. <u>Deck</u> and other cases reveal that even the rule against placing a defendant in shackles in the courtroom in front of the jury is subject to exception when required by the specific facts of a case. <u>Deck</u>, 544 U.S. at 624-26. Furthermore, the rule applies only to the courtroom during trial and not to other proceedings such as arraignments. <u>Id.</u>  In addition, the Supreme Court requires a showing of actual prejudice on the part of the defendant unless the exposure was so prejudicial that injury can be presumed. <u>Holbrook</u>, 475 U.S. at 571-72.

Here, the exposure happened inadvertently in the hallway, not in the courtroom, and after the trial proceedings had adjourned for the day.  The exposure was extremely brief.  It is uncertain whether *any* juror saw Mr. Kryger and equally uncertain whether he was wearing any handcuffs at the time.  He definitely was not wearing shackles on his legs at the time.  Neither of Mr. Kryger's companions wore any outward manifestation of their status as law enforcement officers.  Mr. Kryger was dressed in street clothes.  Under these circumstances, the exposure was not so prejudicial that this court can

121

presume prejudice.  Therefore, the burden is on Mr. Kryger to demonstrate actual prejudice.  He failed to show actual prejudice before the South Dakota Supreme Court and he failed to do so before this court.

This court concludes that the state court's decision was not an unreasonable application of federal law nor were its factual findings unsupported in the record.  Accordingly, this magistrate judge respectfully recommends granting respondent's motion for judgment on the pleadings on Mr. Kryger's fourth claim for habeas relief.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends granting respondent's motion for judgment on the pleadings [Docket No. 11] as to each of Mr. Kryger's claims and dismissing Mr. Kryger's § 2254 petition with prejudice.

[The balance of this page was intentionally left blank.]

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED November 16, 2022.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

123